#29020-a-JMK
**2020 S.D. 68**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOSE ANIBAL QUINONES RODRIGUEZ,          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RICHARD A. SOMMERS
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

PATRICIA ARCHER
CHELSEA WENZEL
Assistant Attorneys General
Pierre, South Dakota                    Attorneys for plaintiff and
                                      appellee.


THOMAS J. COGLEY of
Cogley Law Office, Prof. LLC
Aberdeen, South Dakota

JOSHUA K. FINER of
Richardson, Wyly, Wise,
   Sauck & Hieb, LLP
Aberdeen, South Dakota                   Attorneys for defendant and
                                      appellant.

* * * *

ARGUED
APRIL 21, 2020
OPINION FILED **12/09/20**

#29020

KERN, Justice

[¶1.]        Following a bench trial, Jose Anibal Quinones Rodriguez (Rodriguez) was convicted of first-degree murder and other offenses in connection with the slaying of Tawny Rockwood (Rockwood) in February 2018.  He appeals his convictions, alleging that the circuit court erred by denying his motion to suppress; refusing to declare certain witnesses adverse; violating his Sixth Amendment rights; and finding him guilty based on insufficient evidence.  He also alleges cumulative error based on the above claims.  We affirm.

**Facts and Procedural History**

[¶2.]        On Friday, February 9, 2018, at 1:30 a.m., a newspaper delivery man was traveling east along Highway 12 near Andover, South Dakota,[1] when he noticed that an apartment building was on fire.  He called 911 for aid.  By the time law enforcement arrived at the scene, flames had consumed one side of the apartment building.  The inferno was concentrated in Tawny Rockwood's upstairs apartment.  Firefighters were unable to immediately locate Rockwood at the scene and began an investigation into her whereabouts.

[¶3.]        Day County Deputy Sheriff Jerred Schreur responded to the 911 call.  He was familiar with the apartment quad-complex, as well as its sole occupant,[2] and remembered that a Dodge pickup truck was often outside the complex in the days leading up to the fire.  Typically, on his commute to work, he would observe

---

1.        Andover is a small town in Day County, South Dakota, located about thirty
         miles east of Aberdeen.

2.        At the time of the call, Depury Sheriff Schreur knew that Tawny Rockwood
         was the only tenant living in the building.

-1-

the truck outside of the building, but he was unsure how long it normally stayed there. He considered the vehicle suspicious because it was unfamiliar to him and it appeared to have been spray painted. For these reasons, on February 7, he recorded the license plate number in order to determine the identity of the owner. On the morning of February 9, shortly after law enforcement officers were alerted about the fire, Deputy Schreur discovered that the vehicle was owned by Rodriguez. He attempted to contact Rodriguez to determine whether he had information regarding Rockwood's whereabouts, but the call went to Rodriguez's voicemail.

[¶4.]     Concerned about Rockwood, Deputy Schreur requested the assistance of other law enforcement agencies in locating Rockwood and Rodriguez. Aberdeen Police Department Detectives Kyle Fadness and Jeff Neal visited the residence of Agnes Quinones-Rios (Agnes), Rodriguez's daughter, at about 8:45 a.m. on February 9. As they drove up to Agnes's house, the detectives observed a male, later identified as Rodriguez, entering it. They also saw that a spray-painted Dodge pickup was parked near the house. Hoping that Rodriguez would come back outside, the detectives parked across the street and waited. At some point, Rodriguez left the house and got into the driver's seat of a white Jeep with tinted windows. When he did not drive away, Detective Fadness approached the Jeep and asked Rodriguez if he would answer some questions. Rodriguez agreed and followed Detective Fadness back to his car to talk, rather than stand outside because the weather was cold. The detectives did not advise Rodriguez of his *Miranda* rights, restrain him, or place him under arrest.

[¶5.]     Once inside the car, Detective Fadness tried to tell Rodriguez about the fire, but it quickly became clear that English was not his native language. To assist with communication, Detective Fadness called Marie DeGroot, an Aberdeen City employee who spoke Spanish, and placed the call on speakerphone.[3]

[¶6.]     During the discussion, Rodriguez stated that he and Rockwood were in a relationship and that he had driven to her residence on Wednesday, February 7, and spent the night there. According to Rodriguez, he remained at her apartment for most of the next day, February 8, before leaving to return to Aberdeen at around 8:00 p.m. Rodriguez claimed that about thirty minutes later, he arrived at his daughter's house in Aberdeen, where he took a shower. Then he went to his brother Wilberto's house, borrowed a white Jeep, and filled it up with gas at the Holiday gas station. He explained that he went on several errands in the Jeep that night, including driving it to purchase beer and to Walmart to buy a space heater for warmth so that he could sleep in the Jeep. At some point, Rodriguez indicated that he also went to a friend's house, but the interpreter had a difficult time understanding the name of the friend.[4]

[¶7.]     The friend, Gaver Glover (Glover), had been with Rodriguez and Agnes on several occasions during the evening of February 8 and early morning hours of

---

3.    The conversation was recorded and ultimately entered into evidence at Rodriguez's trial.

4.    At first, DeGroot believed Rodriguez was saying "Pete," but later, when Rodriguez spelled the name, he indicated his friend's name was K-I-T. The officers later determined that Kit was Glover, who went by the nickname "Kid," which Rodriguez pronounced "Keith."

February 9. Glover previously had a romantic relationship with Agnes and talked to her often.

[¶8.] At the same time that Detective Fadness was interviewing Rodriguez in their car, officers arrived to question Agnes. She informed them that Rockwood was not in her house and permitted them to enter to look for her. While the officers were walking through the premises, they observed a red gas can in a shed behind the house. Officers did not need to enter the shed to see the can because the door to the shed was open.

[¶9.] When Detective Fadness asked Rodriguez about the gas can, he indicated that it was his brother's and that Wilberto had put it in the shed. He told the detective that he also owned a gas can, stating that his was in the back of his Dodge truck. Rodriguez agreed to surrender his clothes and cell phone to law enforcement. However, he informed the detective that he had broken his phone the day before by inadvertently dropping it and running over it with his pickup. Once they retrieved these items from Rodriguez, they concluded the interview.

[¶10.] Three agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) arrived in Aberdeen that day (February 9) to work on an unrelated case and also interviewed Rodriguez about the fire and Rockwood's whereabouts. Rodriguez was working on the Jeep outside of Agnes's house when they arrived. He consented to speak with them and followed the ATF agents into their suburban. At the outset of the conversation, the ATF agents informed Rodriguez that he was not under arrest and was free to leave.

[¶11.]     Much of the interview was conducted in Spanish.  The agents did not procure a foreign language expert to assist them in interviewing Rodriguez; instead, they spoke with him in Spanish and English.[5]  Rodriguez repeated the information that he had told Detective Fadness earlier that day.

[¶12.]     Meanwhile, various state and federal agencies were investigating the apartment fire.  Because they considered its origin to be suspicious, officers obtained a search warrant for the premises, and a search began shortly after noon on February 9.  The apartment and all of its contents were heavily damaged by the fire.  After hours of searching through the debris, officers found Rockwood's remains in what used to be the living room area.  Her body was severely burned, but officers were able to observe a bullet wound to her head.  Dr. Kenneth Snell, a pathologist from Sioux Falls, later conducted an autopsy, which revealed that Rockwood suffered two bullet wounds to her skull, one of which was the cause of her death.  During his examination, Dr. Snell removed an intact bullet from Rockwood's hair.

[¶13.]     Several days later, an Aberdeen police officer was searching a dumpster in an alley to assist with an unrelated case when he opened a garbage bag and found a beer carton with a black handgun inside.  The officer seized the gun and submitted it to the State laboratory in Pierre for analysis.  The State's ballistics expert, Frans Martiz, examined the gun.  The gun, which was a Hi-Point model JCP Smith & Wesson .40 caliber, was damaged but the serial number remained intact.  Martiz repaired the gun and fired a test bullet for purposes of comparison to the

---

5.     One of the agents, Special Agent Elizabeth McElroy, had some familiarity with Spanish and conducted most of the interview.  The others knew some Spanish, but not enough to be considered proficient.

bullet found in Rockwood's hair. After conducting a microscopic comparison of the rifling marks on the two bullets, Martiz conclusively determined that the bullet found in Rockwood's hair was fired by the gun found in the dumpster.

[¶14.]    In their search to discover the identity of the gun owner, law enforcement contacted EZ Pawn Shop in Aberdeen and requested that it search its records regarding the gun. Angela Johnson (Johnson), the shop manager, located a record revealing that Jamie Lynn Farmer (Farmer) purchased the gun in question for $200 in October 2017.[6] Johnson informed police that she knew Farmer because Johnson managed a rental property that Farmer occupied. She provided law enforcement with a rental property agreement for the unit and explained that Rodriguez lived in the apartment with Farmer.

[¶15.]    Officers obtained a search warrant for Wilberto's Jeep and Rodriguez's Dodge pickup and recovered a nylon gun holster, butane lighters, a gas can from the Dodge pickup and a propane torch from the Jeep. Officers also reviewed several surveillance videos taken from the Holiday gas station and the Walmart in Aberdeen to establish Rodriguez's whereabouts throughout the night of February 8 and into the morning hours of February 9. They discovered that Rodriguez went to the Holiday gas station at 9:04 p.m. on February 8. While there, he walked into the view of the camera, but did not purchase anything. Later that night, at 12:48 a.m., a white Jeep pulled into the gas station, and Rodriguez entered the gas station. A surveillance video from Walmart showed that he was in Walmart between 1:18 a.m.

---

6.    Before EZ Pawn will sell a firearm, it requires the purchaser to produce a state issued ID and pass a background check.

and 1:32 a.m. A time stamped video from the Holiday gas station depicted Rodriguez with another man, later determined to be Glover, buying beer at 1:52 a.m.

[¶16.] During their interviews with law enforcement, both Agnes and Glover made statements regarding Rodriguez's whereabouts on the night of the murder. Agnes was interviewed by Federal Agent Kevin Wiese the morning of February 9. She stated that Rodriguez called her on Thursday evening (February 8) to talk to her about Rodriguez's vehicle that she had sold to Glover earlier that day. She explained that Rodriguez used Rockwood's cell phone to initiate the call and indicated that she could hear Rockwood crying in the background. Later that evening, Rodriguez came to her house, threw his clothes in the washing machine, showered, and changed clothes. She described his demeanor while at the house as "crazy." Agnes stated that when he came back to her house the next day, Rodriguez told her that the police were looking for him.

[¶17.] Glover spoke with police several times during the investigation and admitted to lying early on in order to cover for Rodriguez. Eventually, Glover entered into a plea agreement, which required him to testify truthfully against Rodriguez at trial in exchange for dismissal of a felony charge.[7] At trial, Glover testified that he was with Agnes earlier in the evening of February 8, when Rodriguez called him using Rockwood's phone to discuss a vehicle Glover had

---

7. Glover was charged with accessory to homicide in violation of SDCL 22-3-5 for his actions subsequent to the murder. In exchange for his testimony, the State permitted him to plead guilty to misprision of a felony in violation of SDCL 22-11-12. It also agreed to forgo additional charges.

purchased from Rodriguez through Agnes. Glover could hear Rodriguez arguing with a woman, whom Agnes said was Rockwood, in the background. The call ended, and Glover called the number back at 7:51 p.m., and both Glover and Agnes spoke with Rodriguez. During this time, Rockwood's phone made numerous calls in rapid succession to Glover, Agnes, and Wilberto.[8]

[¶18.]    Glover was also at Agnes's house when Rodriguez arrived there around 8:30 p.m. Glover agreed to give Rodriguez an additional $60 for the car. He testified that while he went to get the cash, he believed Rodriguez and Wilberto left to go somewhere together. Later in the evening, Rodriguez admitted to "fuck[ing] up" that evening. At Rodriguez's request, Glover accompanied him to the Holiday gas station to buy beer. Glover testified that Rodriguez drove double the speed limit on slippery road conditions so he could get there before they stopped selling alcohol at 2:00 a.m.

---

8.    The State's Exhibits numbered 39 through 42 show the following calls:

> From 7:54 to 7:56 p.m., Rockwood's phone made six calls to Wilberto's phone and then ceased making calls. (Exhibit 42).
>
> From 7:51 to 7:57 p.m., Rockwood's phone made two calls to Agnes, received three calls from her, and then ceased making calls. (Exhibit 41).
>
> From 7:48 to 7:51 p.m., Rockwood's phone made one call to Glover, received three calls from him, and then ceased making calls. (Exhibit 40).
>
> Rockwood's phone made no calls to Rodriguez's phone during this timeframe. Rodriguez's last call to Rockwood's phone was at 5:54 p.m. (Exhibit 39).

[¶19.]     After purchasing beer from the store just before 2:00 a.m., they went back to Glover's apartment, where Rodriguez asked Glover to download a police scanner application for him.  Earlier in the evening, Rodriguez was listening to Glover's scanner and heard his own phone number being transmitted through the radio.  Because Rodriguez did not have a phone, Glover loaned him a spare to allow him to listen to the scanner.  At some point, Rodriguez also gave Glover a black pistol and some bullets to keep for him until Wilberto could come and pick them up the next day.  Glover kept the gun overnight, testifying that he returned it to Rodriguez in the morning.

[¶20.]     Eventually, Rodriguez was indicted on charges of first-degree murder, first-degree felony murder, second-degree murder, first-degree arson, first-degree burglary, commission of a felony while armed with a firearm, and aggravated assault.  The State dismissed the first-degree felony murder charge prior to trial.  Rodriguez waived his right to a jury trial.

[¶21.]     The case was tried to the court from May 13-28, 2019.  During its case-in-chief, the State called thirty-seven witnesses to the stand.  In addition to the evidence summarized above, the State introduced testimony tying Rodriguez to the gun and circumstantial evidence regarding his and Wilberto's whereabouts after the murder.

[¶22.]     Anthony Olsen, Rockwood's former boyfriend, testified on behalf of the State that on a prior occasion, Rodriguez had brandished a Hi-Point pistol at him.  And Highway Patrol Trooper John Berndt indicated that Rodriguez had a magazine clip loaded with .40 caliber bullets on him during a traffic stop in 2017.

[¶23.] Wilberto also testified on behalf of the State, that he saw Rodriguez on the night of the murder at Agnes's house, where Rodriguez asked Wilberto for money. Wilberto insisted that he went home at 11:00 p.m. and did not see Rodriguez again that night. He also testified that he was in possession of his cell phone on the evening of February 8 through February 9. However, FBI Special Agent Jay Berni, a cell phone data analyst, testified that he linked the cell phone data from Wilberto's phone to multiple cell towers east of Aberdeen throughout the evening. The data trail appeared to show Wilberto's phone traveling from Aberdeen toward the direction of Andover and back again. Agent Berni also reviewed data from Rodriguez's cell phone. He testified that the last activity on Rodriguez's phone occurred at 6:03 p.m. on the evening of the murder, that a call was placed to a number later determined to be Glover's, and that the phone was linked to a tower east of Aberdeen in the direction of Andover.

[¶24.] The State called Agnes to the stand, and she testified about details of her living situation at the time of the incident and explained that her father kept belongings in her home and came and went as he wished. When the State attempted to question her about the content of her statements to Agent Weise, she indicated she could not remember. Although she remembered being interviewed, she could not recall any information about her father's whereabouts on February 8 or 9, 2018. Based on her apparent lack of recollection, Rodriguez moved to declare her unavailable pursuant to SDCL 19-19-804(a)(3). The circuit court denied the motion as premature. When the State attempted to refresh Agnes's recollection with a transcript of her interview with Agent Weise, she claimed that she was on

drugs at the time and could not remember those days. The State, citing her consistent inability to remember, requested that the court deem her unavailable. Having previously sought the same ruling, Rodriguez did not object, and the circuit court declared her so.

[¶25.] When the State offered the transcript of Agnes's interview into evidence, however, Rodriguez did object. He argued that admission of the transcript constituted a violation of the Confrontation Clause. The court rejected Rodriguez's argument because Agnes was present in the courtroom. In so ruling, the court noted that Agnes was "declared unavailable for purposes of the questions that were asked earlier regarding the interview" and that Rodriguez was free "to cross-examine [Agnes] as to anything in the transcript because she is present." Rodriguez declined the invitation, claiming that he could not examine an unavailable witness. Instead, he renewed his objection with respect to the Confrontation Clause issue, which the circuit court again denied. The court admitted the transcript.

[¶26.] Agent Brandon Neitzert, a DCI agent that had investigated the transactional history of the gun at EZ Pawn, also testified for the State. As part of his investigation, he interviewed Rodriguez's ex-girlfriend, Jamie Farmer. Prior to trial, the State unsuccessfully attempted to procure Farmer's attendance at trial through a material witness warrant. Having failed to locate Farmer, the State moved the circuit court to declare Farmer unavailable and sought admission of her statements to Agent Neitzert as statements against interest pursuant to SDCL 19-19-804(b)(3) in light of her knowledge that Rodriguez was a convicted felon and that he had possession of the gun after she purchased it.

[¶27.]    Rodriguez again objected on the basis that the testimony violated the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36, 124 S Ct. 1354, 158 L. Ed. 2d 177 (2004). In response, the State requested the opportunity to make a limited offer of proof so that the court could determine whether the evidence was admissible. The court permitted the proffer and the following exchange occurred:

> **Q:** Agent Neitzert, is there criminal liability for someone to purchase a gun for a felon?
> **A:** Yes.
> **Q:** Is there also criminal liability to leave a gun with a prohibited person?
> **A:** Yes.
> **Q:** Did Ms. Farmer tell you that she knew [Rodriguez] was a convicted felon?
> **A:** Yes.
> **Q:** Did she tell you that he was present when she purchased the gun?
> **A:** Yes.
> **Q:** Did she tell you that she did not handle the gun after the purchase?
> **A:** She did.
> **Q:** Did she also tell you that the gun was left with him?
> **A:** Yes, she did.
> **Q:** Did she tell you that the gun was left with him when she moved out?
> **A:** Yes.

[¶28.]    Following this exchange, the circuit court indicated it would admit the evidence as statements against interest. Regarding the Confrontation Clause issue, the court found no Sixth Amendment violation, but told the parties they were free to brief the issue and that it would reconsider its ruling if persuaded by their authorities. Ultimately, the State chose not to offer Farmer's statements to Agent Neitzert or the recording of her interview with him into evidence.

[¶29.]    During his case-in-chief, Rodriguez presented evidence from fourteen witnesses in support of his alibi and third-party perpetrator defenses. At the

conclusion of the evidence, the State moved to dismiss the first-degree burglary charge, and it was struck from the indictment. The court found Rodriguez guilty of first-degree murder, second-degree murder, arson, commission of a felony while armed with a firearm, and aggravated assault. It sentenced him to life in prison for first-degree murder, twenty-five years for arson, twenty-five years for commission of a felony while armed with a firearm, and fifteen years for aggravated assault, with all sentences to be served concurrently. The court did not impose a sentence for the second-degree murder conviction.

[¶30.]     Rodriguez appeals, raising five issues for our review:

> I.     Whether the circuit court erred by denying Rodriguez's motion to suppress.
>
> II.    Whether the circuit court abused its discretion by declining to declare Brandon Kroll and Agent Neitzert adverse witnesses.
>
> III.   Whether the circuit court violated Rodriguez's Sixth Amendment confrontation rights.
>
> IV.    Whether the evidence presented at trial was sufficient to support the convictions.
>
> V.     Whether Rodriguez's due process right to a fair trial was violated as a result of cumulative errors at his trial.

### Analysis and Decision

### I.     *Whether the circuit court erred by denying Rodriguez's motion to suppress.*

[¶31.]     Prior to trial, Rodriguez moved the circuit court to suppress the statements he made to Detective Fadness and the ATF agents on the basis that his Fifth Amendment rights and his rights under article VI, § 9 of the South Dakota Constitution were violated. In his motion, Rodriguez requested a hearing and the

opportunity to submit a brief thereafter. At the pretrial motion hearing on April 16, 2019, the parties discussed the manner in which the motion should be resolved due to the fact that Rodriguez had waived his right to a jury trial. The court determined that it would reserve judgment on the motion to suppress until trial and that after hearing the relevant evidence, "a proper objection could be made and we could address it at that time."

[¶32.]     At trial, the State called Detective Fadness to testify regarding his exchange with Rodriguez in the detective's car. The State then moved the court to admit the recording into evidence. When asked whether Rodriguez had any objections, defense counsel did not present arguments that Rodriguez's statements to Detective Fadness should be suppressed. Instead, he replied, "I don't know that I can object until I hear it, Your Honor, but if it's the same one I heard I would not object." The court admitted the recording.

[¶33.]     When Agent Weise took the stand to testify regarding his interview with Rodriguez, the State moved the court to admit the second recording into evidence. Again, the defense did not object at the time the evidence was offered, and the court admitted the evidence. Following Agent Weise's testimony, Rodriguez moved to suppress the statements in both recordings for alleged violations of the Fifth Amendment. He presented no argument or authorities in support of his motion but did offer to provide additional briefing. The circuit court considered his motion a renewal of the previous pretrial motion and denied it without responding to Rodriguez's request to submit a brief supporting his motion.

[¶34.] On appeal, Rodriguez does not challenge the constitutionality of his interviews with law enforcement officers. Rather, he asserts procedural error on the basis that the court did not properly dispose of his motion to suppress because it failed to enter findings of fact and conclusions of law. Rodriguez seeks a remand on this issue so that the circuit court may enter findings on his motion. However, aside from filing a bare pretrial motion citing only the state and federal constitutional amendments, Rodriguez presented no information or argument to the court regarding the precise nature of his argument in support of suppression. Nor did he submit proposed findings of fact and conclusions of law to preserve whatever issue he was attempting to raise.

[¶35.] If Rodriguez believed the court's terse denial of his motion to suppress was error, it was Rodriguez's obligation, as the party claiming error, to preserve his record for appellate review. Without any record of the legal or factual basis for his suppression argument, we are left to speculate regarding which grounds for suppression he would have raised. *State v. Fischer*, 2016 S.D. 1, ¶ 12, 873 N.W.2d 681, 687 (requiring a party to identify the reasons for a motion or objection). Because Rodriguez has failed to present a viable issue for review we will not remand for further proceedings.

[¶36.] However, even if Rodriguez had clearly delineated grounds to support that a deprivation of his constitutional rights occurred and supported his claim that his statements to law enforcement should have been excluded, any error would have been harmless. We deem an error harmless if we "may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable

doubt." *State v. Podzimek*, 2019 S.D. 43, ¶ 15, 932 N.W.2d 141, 146. Harmless error "depends upon a host of factors, all readily accessible to reviewing courts." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d. 674 (1986). "These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . [,] the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.* Even if the evidence should have been suppressed, the error was harmless if "the evidence was cumulative of other evidence presented independently at trial." *State v. Davi*, 504 N.W.2d 844, 855 (S.D. 1993).

[¶37.] On appeal, Rodriguez has failed to identify any material evidence obtained from his statements that was not cumulative to other evidence admitted at trial through other witnesses and exhibits. In particular, even if Rodriguez's admission to law enforcement, that he was with Rockwood during the evening of February 8, had been suppressed, this same fact was established through Glover's testimony. Glover testified that he was with Agnes when Rodriguez called, and he could hear Rodriguez arguing with a crying woman who he believed to be Rockwood. The phone records further showed that Rodriguez used Rockwood's phone to make this call, which took place a short time before the murder.[9]

[¶38.] Glover also testified that he was at Agnes's house when Rodriguez arrived at 8:30 p.m. This testimony placed Rodriguez at Agnes's house shortly after

_____

9. In fact, the phone records reveal that while Glover and Agnes were together, there were flurries of phone calls back and forth with Rodriguez using Rockwood's phone.

the murder, a fact that Rodriguez had admitted to law enforcement. Additionally, although the recording contained Rodriguez's statement to law enforcement that he had borrowed the white Jeep from Wilberto, law enforcement had observed Rodriguez sitting in the white Jeep outside Agnes's residence before speaking with him. Glover also testified that he had seen Rodriguez outside Agnes's house working on a white Jeep the morning after Rockwood's murder. Further, while Rodriguez had told the officers about running several errands in the Jeep on the night in question to purchase items at a Holiday gas station and at Walmart, Glover likewise described running an errand with Rodriguez in the Jeep, specifically their trip to a Holiday gas station to buy beer. Video surveillance tapes from Walmart and the Holiday gas station independently establish the timeline of Rodriguez's activities on February 8, the night of the murder, and the early morning hours of February 9. Moreover, Glover testified that at some point, Rodriguez told him he had "fucked up" that night. Based on our review of the record, if the court erred in not suppressing Rodriguez's statements, the error was harmless because the statements were cumulative to other evidence received.

### II. Whether the circuit court abused its discretion by declining to declare Brandon Kroll and Agent Neitzert adverse witnesses.

[¶39.] During his case-in-chief, Rodriguez called Brandon Kroll (Kroll), Rockwood's ex-boyfriend, whom he designated as a potential third-party perpetrator, and DCI Agent Neitzert to the stand. Prior to questioning either witness, he requested that the circuit court declare the witnesses adverse. The State objected on the basis that Rodriguez had not yet asked any questions that

would support an adverse witness designation. The court agreed, denying Rodriguez's motion, and Rodriguez began questioning the witnesses.

[¶40.]     Rodriguez questioned Kroll in an attempt to establish that Kroll, and not Rodriguez, was responsible for Rockwood's death. At no point during this testimony did Rodriguez renew his request to declare Kroll adverse, and Kroll answered all the questions Rodriguez asked.

[¶41.]     SDCL 19-19-611 provides the mode and form a party should use when questioning witnesses. The rule provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." SDCL 19-19-611(c). Ordinarily, leading questions are appropriate "(1) [o]n cross-examination; and (2) [w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." *Id.* However, "[i]t is settled law that permitting the use of leading questions is within the discretion of the [circuit] court." *State v. Brown*, 285 N.W.2d 843, 845 (S.D. 1979). To mandate reversal, an abuse of discretion and a showing of prejudice is required. *Id. See also Armstrong v. Longview Farms, LLP*, 2020 S.D. 1, ¶ 20, 938 N.W.2d 425, 430. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Spaniol*, 2017 S.D. 20, ¶ 12, 895 N.W.2d 329, 335.

[¶42.]     While both witnesses were either adverse or potentially hostile to Rodriguez, there is no evidence of an abuse of discretion here. The record demonstrates that the circuit court permitted Rodriguez's counsel significant leeway when examining Kroll and Agent Neitzert. Indeed, his examination of the

witnesses only drew three objections, and of those, the State challenged the form of the question as leading only once and that objection was overruled. Because Rodriguez has not shown how his examination was restricted, he has failed to demonstrate any error, much less the prejudicial error, which is required for reversal. *See, e.g., Nicolay v. Stukel*, 2017 S.D. 45, ¶¶ 30-31, 900 N.W.2d 71, 82; *Brown*, 285 N.W.2d at 845; *Longview Farms*, 2020 S.D. 1, ¶ 20, 938 N.W.2d at 430.

### III. Whether the circuit court violated Rodriguez's Sixth Amendment confrontation rights.

#### a. Statements of Jamie Farmer

[¶43.] Rodriguez contends that his rights under the Sixth Amendment were violated through the State's use of pretrial statements made by Farmer and by Agnes to law enforcement. As to Farmer, he alleges that the court erred by permitting a proffer from Agent Neitzert, without first determining whether Farmer's statements were testimonial and therefore precluded by *Crawford*, 541 U.S. 36, 124 S. Ct. at 1354. Although the challenged statements were never offered into evidence, Rodriguez argues he was prejudiced because the court heard Agent Neitzert's testimony about the statements and he was unable to cross-examine them due to Farmer's absence. Rodriguez, however, has not presented this Court with any authority that indicates that an offer of proof, in and of itself, especially one that was not actually admitted into evidence, can be considered a constitutional violation. Failure to cite authority renders a claim unpreserved for review on appeal. *State v. Uhing*, 2016 S.D. 93, ¶ 15, 888 N.W.2d 550, 555.

[¶44.] Nonetheless, we dispose of the issue here because it has no merit. It is well settled that a circuit court is presumed capable of "sift[ing] through any excess

or . . . inadmissible evidence" to determine what is properly relevant and admissible. *Edgar v. Mills*, 2017 S.D. 7, ¶ 23, 892 N.W.2d 223, 230. While the court ruled that the statements made between Farmer and Agent Nietzert would be admissible, the State ultimately chose not to offer them as evidence. There is nothing in this record that indicates that the court relied on Farmer's statements to support its decision to convict Rodriguez of any of the charges.

[¶45.]      Instead, the court, in its oral findings, made the following statements with respect to Famer's role in purchasing the gun: "The testimony about the Hi-Point pistol being purchased by his then live-in girlfriend, Jamie Farmer, is unrefuted, undisputed. She lived with him in 1522 Herret Street. She's gone. Witnesses testified that that was his gun; that he had that gun in his possession and pointed it at people." One such witness was Johnson, the manager of EZ Pawn, who testified that the shop records named Farmer as the purchaser. The court also considered the testimony of the clerk who recalled the transaction and testified that Rodriguez was with Farmer when she purchased the gun. Rodriguez's Sixth Amendment right to confront Farmer was not violated because there is no evidence that the court considered Farmer's proffered testimony. The circuit court did not err when it permitted the State to present its offer of proof.

### b. Statements of Agnes Quinones-Rios

[¶46.]      Rodriguez also claims that the circuit court violated his rights under the Sixth Amendment by admitting a transcript of Agnes's statement to officers regarding her interactions with him on the night of the murder. The question whether a defendant's "Sixth Amendment right to confrontation was violated [] is a

constitutional question, which we review de novo." *Spaniol*, 2017 S.D. 20, ¶ 23, 895
N.W.2d at 338. "The Confrontation Clause of the Sixth Amendment to the United
States Constitution, as applied to South Dakota through the Fourteenth
Amendment, requires that in all criminal cases, the defendant has the right to be
confronted with the witnesses against him." *Id.* ¶ 24, 895 N.W.2d at 338-39; *see
also Crawford*, 541 U.S. 36, 124 S. Ct. 1354. A violation of the Confrontation Clause
"occurs when the witness making the testimonial statements is both unavailable
and has not previously been subject to cross-examination." *State v. Richmond*, 2019
S.D. 62, ¶ 30, 935 N.W.2d 792, 801. But if the witness is both available and subject
to cross-examination, the Confrontation Clause is generally not offended. *See State
v. Toohey*, 2012 S.D. 51, ¶¶ 16-18, 816 N.W.2d 120, 128-29.

[¶47.] Because Agnes did not remember making the statements to officers
due to her drug usage, Rodriguez argues that even though she was physically
present, he could not meaningfully cross-examine her, so she was entirely
unavailable for cross-examination. Rodriguez suggests the circuit court's decision to
grant the State's request to declare Agnes unavailable for purposes of the hearsay
exception in SDCL 19-19-804(a)(3) supports his argument that he was denied his
Sixth Amendment right to confront and cross-examine her.[10] In response, the State
contends that declaring Agnes unavailable due to loss of memory does not
necessarily make her unavailable for purposes of the Confrontation Clause. For
support, the State relies upon *Toohey*, in which we explained that "memory loss

---

10. SDCL 19-19-804(a)(3) provides the circumstances under which a declarant is
considered unavailable, including when those that testify do not remember
the subject matter.

may not render a witness unavailable in the constitutional sense." 2012 S.D. 51, ¶ 16 n.2, 816 N.W.2d at 128 n.2.

[¶48.] In *Toohey*, we held that a child witness that struggled to respond to questions on cross-examination nevertheless satisfied the availability requirement under *Crawford* and the Confrontation Clause. *Id.* ¶ 18, 816 N.W.2d at 129. In explaining our reasoning, we observed that *Crawford* took an "almost categorical" approach to availability, meaning that "even a witness with no memory of the events in question is nevertheless present and available for cross-examination under *Crawford.*" *Id.* ¶ 16, 816 N.W.2d at 128. Yet, in *Toohey*, we noted that the witness "did more than simply appear in court." *Id.* ¶ 17, 816 N.W.2d at 128-29. "She was able to testify about when and where the incidents with Toohey took place . . . and what was said." *Id.*

[¶49.] When situations arise where a defendant must confront a witness with faulty memory, the United States Supreme Court provides helpful direction when analyzing the degree to which the witness is available for examination. In *United States v. Owens*, for instance, the Supreme Court considered the availability of a victim with severe memory impairment due to being "brutally beaten with a metal pipe." 484 U.S. 554, 556-57, 108 S. Ct. 838, 840-41, 98 L. Ed. 2d. 951 (1988). During his testimony, the victim described his memory of events immediately preceding the attack and during the assault. *Id.* at 556, 108 S. Ct. at 841. Although he also testified that he remembered identifying his assailant when he was interviewed by an FBI agent, he admitted on cross-examination that he could not remember actually seeing the assailants. *Id.* He also testified that he neither

remembered receiving visitors in the hospital nor recalled whether any of those visitors suggested that the defendant could have been his attacker. *Id.* Defense counsel attempted to refresh the victim's recollection that while he was in the hospital, he had accused someone else of being the assailant, but this attempt to refresh the victim's memory was unsuccessful. *Id.*

[¶50.] In holding that the victim was available for purposes of the Sixth Amendment, the Court reaffirmed the well-accepted proposition that "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 559, 108 S. Ct. at 842. The Court referenced its holding in a prior case that the opportunity for cross-examination "is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even . . . the very fact that he has a bad memory." *Id.* (referring to the witness scenario present in *Delaware v. Fensterer*, 474 U.S. 15, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)). The Court then continued its analysis by comparing the slightly different scenario present in *Owens*, which is more similar to the one here, and concluded: "If the *ability* to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to his current belief, the basis for which he cannot recall, we see no reason why it should not suffice *when the witness' past belief is introduced and he is unable to recollect the reason for that past belief.* In both cases the foundation for

the belief (current or past) cannot effectively be elicited, but other means of impugning the belief are available. *Id.* (emphasis added).[11]

[¶51.]    Here, unlike the situation in *Owens*, even though Rodriguez had the opportunity to do so, he declined to "impugn" Agnes's claimed memory loss through cross-examination.[12] The circuit court accordingly ruled that Rodriguez waived his right to confront Agnes when he refused his opportunity to cross-examine her. Rodriguez's choice not to cross-examine Agnes and instead use her inability to recall the events in question to attack her credibility, does not equate to a violation of his constitutional rights. On the contrary, Rodriguez must establish that he was denied "the traditional protections of the oath, cross-examination, and opportunity for the [fact-finder] to observe the witness'[s] demeanor" secured by the Sixth Amendment. *Id.* at 560, 108 S. Ct. at 843. This he has failed to do.

[¶52.]    Our holding does not announce a categorical rule that, so long as a witness is physically present for cross-examination, there is never a violation of the Confrontation Clause.[13] But, based on our review of the record here, we conclude

---

11.    The Court in *Owens* related as a specific example a witness stating, "I don't know whether this is the man who assaulted me, but I told the police I believed so earlier." *Id.* Such a statement is similar to the scenario here.

12.    Rodriguez's decision not to cross-examine Agnes as to her lack of memory is not surprising given that her expressed failure to recall the events occurring on the night in question ultimately allowed Rodriguez to cast doubt on any damaging information she had previously provided to law enforcement.

13.    The Eighth Circuit reaffirmed the importance of considering the circumstances of each case in making the determination of unavailability stating:

(continued . . .)

that Agnes "was available for cross-examination in accord with the Confrontation Clause" and thus, whether her prior statements were testimonial matters not. *See Toohey*, 2012 S.D. 51, ¶ 18 n.3, 816 N.W.2d at 129 n.3. Therefore, Rodriguez has not established that the court's admission of the transcript of Agnes's interview with law enforcement officers violated his Sixth Amendment right to confront and cross-examine the witnesses called against him.[14]

[¶53.]     However, even if the admission of Agnes's statements violated the Sixth Amendment, their admission was harmless error. The only hearsay statements admitted solely through Agnes's interview were her comments that Rodriguez washed a load of clothes after he arrived at her house and took a shower there later in the evening. The State repeated these statements in its closing

_____

(. . . continued)

> To be sure, simply putting a child on the stand, regardless of her mental maturity, is not sufficient to eliminate all Confrontation Clause concerns. If, for example, a child is so young that she cannot be cross-examined at all, or if she is simply too young and too frightened to be subjected to a thorough direct or cross-examination[,] . . . *the fact that she is physically present in the courtroom should not, in and of itself, satisfy the demands of the Clause.* Under *Owens*, however, a perfectly satisfactory cross-examination is not required by the Clause, and a witness who cannot remember the details of statements she has made in the past *can still be sufficiently available* for cross-examination to satisfy the constitutional requirement.

> *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1474 (8th Cir. 1991) (internal citations omitted) (emphasis added).

14.   Rodriguez did not object on the ground that the transcript of Agnes's law enforcement interview was hearsay that did not fall within a statutory exception for admission. Therefore, we decline to address this issue because it was not preserved for appeal. Nevertheless, as noted herein, even if wrongly admitted, the error was harmless because the challenged evidence was largely cumulative to that properly admitted through other sources.

argument. Each of Agnes's other statements, including her description of Rodriguez's erratic behavior, his desire to download a police scanner app, and the phone calls Rodriguez made to Agnes and Glover with Rockwood crying in the background, were properly admitted through Glover's testimony. Therefore, when viewed against the cumulative nature of other evidence in this case, we "may confidently say, on the whole record" that even if the court erred by admitting the transcript of Agnes's testimony, Rodriguez's alleged Sixth Amendment violation was "harmless beyond a reasonable doubt." *See Podzimek*, 2019 S.D. 43, ¶ 15, 932 N.W.2d at 146.

### IV. *Whether the evidence presented at trial was sufficient to support the convictions.*

[¶54.] "The denial of a motion for judgment of acquittal is a question of law we review de novo." *State v. Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d 20, 25. "In measuring evidentiary sufficiency, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Patterson*, 2017 S.D. 64, ¶ 27, 904 N.W.2d 43, 51.

[¶55.] Here, Rodriguez waived his right to a jury trial and chose to try his case to the court. In the instance of a non-jury criminal trial, the "court shall make general findings and shall in addition, on request made before submission of the case to the court for decision, find facts specially. Such findings may be oral." SDCL 23A-18-3. "[W]hen factual findings have been made, and those findings are not clearly erroneous, an appellate court may not set aside those findings and imply contradictory findings." *State v. Nekolite*, 2014 S.D. 55, ¶ 13, 851 N.W.2d 914, 918.

#29020

"On review, this Court defers to the [trial] court, as fact finder, to determine the credibility of witnesses and the weight to be given to their testimony." *Id. See also Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 26, 784 N.W.2d 499, 511.

[¶56.]      Prior to trial, Rodriguez requested that the circuit court issue special findings prior to rendering a verdict. *See generally* SDCL 23A-18-3.[15]  At the conclusion of the evidence, the court made oral findings in support of its decision to convict Rodriguez of first-degree murder, second-degree murder, commission of a felony with a firearm, first-degree arson, and aggravated assault.  On appeal, Rodriguez does not allege that any particular finding is erroneous but rather makes a general challenge to the sufficiency of the evidence supporting the convictions, arguing that the State failed to prove he committed the crimes.  Accordingly, we review each conviction in turn to determine whether Rodriguez's guilty verdict is sufficient in light of the evidence.

[¶57.]      "Homicide is murder in the first degree . . . if perpetrated without authority of law and with a premeditated design to effect the death of the person killed or any other human being, including an unborn child[.]"  SDCL 22-16-4(1). Per SDCL 22-16-5, premeditation means:

> an intention, purpose, or determination to kill or take the life of
> the person killed, distinctly formed and existing in the mind of
> the perpetrator before committing the act resulting in the death
> of the person killed.  A premeditated design to effect death

---

15.    SDCL 23A-18-3 provides: "In a case tried without a jury a court shall make a general finding and shall in addition, on request made before submission of the case to the court for decision, find facts specially.  Such findings may be oral.  If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein."

sufficient to constitute murder may be formed instantly before committing the act.

We have also outlined a list of factors that may be considered to determine the existence of premeditation. Those include: "(1) the use of a lethal weapon; (2) the manner and nature of the killing; (3) the defendant's actions before and after the murder; and (4) whether there was provocation." *State v. Wright*, 2009 S.D. 51, ¶ 60, 768 N.W.2d 512, 532. "[D]irect proof of deliberation and premeditation is not necessary. It may be inferred from the circumstances of the killing." *Id.*

[¶58.] Second-degree murder under SDCL 22-16-7 requires commission of "any act imminently dangerous to others and evincing a depraved mind, without regard to human life[.]" Assessing the existence of a depraved mind is "determined from the conduct itself and the circumstances of its commission." *State v. Laible*, 1999 S.D. 58, ¶ 14, 594 N.W.2d 328, 333.

[¶59.] As an initial matter, we note that the parties stipulated that Rockwood died of gunshot wounds to the head and that the manner of her death was homicide. The unresolved issues, then, were the identity of Rockwood's killer and the mens rea involved in each offense. With respect to first-degree murder, the court found that Rodriguez killed Rockwood with premeditation on February 8, 2018, in Day County. *See* SDCL 22-16-4(1) (listing premeditation as an element of first-degree murder). With reference to the alternative count of second-degree murder, the court found that when Rodriguez killed her, he committed an act that was "imminently dangerous to others."

[¶60.] A close review of the record reveals that there is more than sufficient evidence to support the court's findings. Throughout the course of the trial, the

circuit court considered unrefuted evidence that placed Rodriguez in Andover and with Rockwood on February 8, the day of her death. A deputy sheriff noticed his pickup by the apartment that morning. Barry Smith testified that Rodriguez was at the Other Bar in Andover that evening at 6:57 p.m. Glover testified that Rodriguez had called him and Agnes earlier in the evening using Rockwood's phone and that Rockwood could be heard crying in the background. The last contact with Rodriguez using Rockwood's phone occurred at 7:57 p.m.

[¶61.]     The court also considered evidence tying the murder weapon, a particular Hi-Point pistol, to Rodriguez. Rockwood's former boyfriend, Anthony Olsen, testified that Rodriguez had previously brandished the gun in his presence. Additionally, the EZ Pawn clerk testified that she remembered selling that specific pistol to Farmer and stated that Rodriguez was with Farmer when she bought it. Johnson also linked Farmer and Rodriguez together through her testimony that Farmer and Rodriguez lived together during this time frame at a rental property that Johnson managed. The State's firearm expert testified that in his opinion, the Hi-Point gun discovered in the dumpster was the weapon used to kill Rockwood. The court specifically relied on this opinion in its findings.

[¶62.]     The evidence related to Rodriguez's demeanor and actions following the murder also support the circuit court's finding of guilt regarding the homicide.[16]

---

16.   Although not included in the circuit court's findings, the court heard evidence regarding several recorded calls Rodriguez made from the jail. In one call, which he made to Wilberto, the court heard a translation of Rodriguez saying that, "I just call you the—the—the food for the—Nena. Keith [Glover]—I gave it to Keith in the car to take them . . . . All that has to be secured." To

(continued . . .)

Glover, whom the court found credible, testified regarding Rodriguez's bizarre behavior that evening. He testified that Rodriguez had requested access to a police scanner app so that he could listen to dispatch radio broadcasts. After Rodriguez heard his cell phone number over the scanner, he gave Glover a gun matching the description of the murder weapon and bullets and asked that Glover keep them for him overnight and give them to Wilberto in the morning.

[¶63.] Glover also testified that, although he never saw Rodriguez with his cell phone, he did observe Rodriguez with a SIM card and testified that Rodriguez asked Glover if it could be traced. Glover recalled eventually handing Rodriguez one of his own cell phones, which had a police scanner app on it for listening to law enforcement calls, dispatch calls, and radio broadcasts. Although Rodriguez challenges Glover's credibility on appeal, we refrain from reweighing the evidence or reevaluating the credibility of the witnesses, as this is within the exclusive province of the circuit court. *See Nekolite*, 2014 S.D. 55, ¶ 13, 851 N.W.2d at 917-18.

[¶64.] Officers also recovered a nylon gun holster, butane lighters, and a gas can from Rodriguez's Dodge pickup, and a propane torch from Wilberto's Jeep. Additionally, data from Wilberto's phone placed Wilberto between Aberdeen and Andover at 11:05 p.m. And even though the data contradicts Wilberto's testimony

---

(. . . continued)
this, Wilberto replied, "What did you do with the pills?" Rodriguez then explained that they were "in Keith's Tahoe."

The word Nena in Spanish, the translator explained, can mean an object. The State's theory throughout trial was that "Nena" meant gun, "pills" meant bullets, and the call referred to the location of the gun.

that he went home at 11:00 p.m. and did not see Rodriguez after that, the circuit court considered this conflict and discounted his testimony noting "I do not believe anything that [Wilberto] told me, quite frankly."

[¶65.]       In assessing the evidence, the court also found Rodriguez's presence in the Holiday gas station and in Walmart throughout the evening in question to be nothing more than "an attempt to establish an alibi." It therefore declined to consider this evidence as exculpatory. As for Rodriguez's third-party perpetrator defense, the court wholly rejected the theory that Kroll, rather than Rodriguez, committed the crime. It found that "[t]he idea that somehow Mr. Kroll came into possession of that gun and used it to murder Tawny Rockwood is unsupported by any evidence that exists." Instead, the court found that "[w]itnesses testified that [the Hi-Point pistol] was [Rodriguez's] gun [and] that he had that gun in his possession and pointed it at people." Based on our review of the record and the circuit court's findings, there is sufficient evidence to support Rodriguez's convictions for first- and second-degree murder.

[¶66.]       We turn next to commission of a felony with a firearm pursuant to SDCL 22-14-12. The statute provides that "Any person who commits or attempts to commit any felony while armed with a firearm, including a machine gun or short shotgun, is guilty[.]" *Id.* It is undisputed that homicide is a felony. Additionally, as we noted earlier, the parties stipulated that Rockwood died of two gunshot wounds to the head. Finally, the circuit court found that Rodriguez killed Rockwood. These stipulations and findings, which are supported by the record, are sufficient to sustain his conviction for commission of a felony with a firearm.

[¶67.]      As regards the crime of first-degree arson, SDCL 22-33-9.1, provides in part that "[a]ny person who starts a fire or causes an explosion with the intent to destroy any occupied structure of another is guilty of first degree arson." The parties stipulated that the fire was an arson, "intentionally set to destroy the building[.]" As with the murder charges, the question that remained was the identity of the perpetrator. With respect to this conviction, the court concluded that Rodriguez set the fire for purposes of destroying the evidence of the murder. The court found that after he killed Rockwood, Rodriguez returned to Aberdeen in order to gather supplies and assistance to burn the apartment building down. These findings are supported by the evidence. Law enforcement uncovered gas cans, lighters, and a butane torch in vehicles associated with Rodriguez. Investigators also located the remnants of a melted gas can in the hallway by Rockwood's apartment.

[¶68.]      The court also considered cell phone tower data showing Wilberto's phone leaving Aberdeen prior to the fire. Cell phone data revealed that the phone made contact with a tower in Aberdeen at 10:49 p.m. At 11:05 p.m., it used a signal from a cell tower near Groton, which is a small community located between Aberdeen and Andover. The phone's signal was then located between 11:38 p.m. and 11:42 p.m. using the tower east of Bath, indicating that the phone was traveling back to Aberdeen. By 11:53 p.m., the phone signal had returned to Aberdeen. As the circuit court found, "there was no explanation why Wilberto's phone would be traveling that direction on that particular night at that particular time." The court was free to give this evidence, although circumstantial, weight

equal to that of the direct evidence. *State v. Webster*, 2001 S.D. 141, ¶ 13, 637 N.W.2d 392, 396.

[¶69.] While Rodriguez attempts to suggest it would be physically impossible for him to travel from Aberdeen to Andover and back in 64 minutes, Rodriguez's own witness, Angela Locke, testified otherwise. After finishing a midnight shift at work in Aberdeen, Locke made the trip between the two towns in the early morning hours of February 9 around the time of the discovery of the fire. In total, she stated that the drive between Aberdeen and Andover took her approximately 25 minutes and that she arrived back in Andover at approximately 12:45 a.m. As the State notes, "[s]urely someone on a mission to get to Andover, commit a serious criminal act, and leave quickly to avoid detection could complete the trip in even less time." The evidence, while circumstantial, is strong and sufficient to support Rodriguez's first-degree arson conviction.

[¶70.] Finally, Rodriguez was convicted of aggravated assault pursuant to SDCL 22-18-1.1(1), which provides that "[a]ny person who [] [a]ttempts to cause serious bodily injury to another, or causes such injury, under circumstances manifesting extreme indifference to the value of human life . . . is guilty of aggravated assault." There can be no question that fatally shooting another person constitutes serious bodily injury. Further, firing a gun at another certainly "manifests extreme indifference to the value of human life." In this case, the circuit court found that Rodriguez shot Rockwood in the head twice, causing her death. This evidence supports Rodriguez's aggravated assault conviction. Based on the

foregoing analysis and in light of the evidence as a whole, sufficient evidence exists to support Rodriguez's convictions.

### V. Whether Rodriguez's due process right to a fair trial was violated as a result of cumulative errors at his trial.

[¶71.] As his final claim of error, Rodriguez asserts that the alleged errors, when considered as a whole, support a finding that he has been denied his constitutional right to a fair trial. *See Davi*, 504 N.W.2d at 857. Because the circuit court did not err in the evidentiary rulings challenged herein, or, if error occurred, the error was harmless, we need not address this issue.

### Conclusion

[¶72.] Rodriguez did not adequately preserve his suppression motion by setting forth the grounds for the alleged constitutional violation. Although he renewed his suppression motion and asked the court if it wanted briefs after trial, he did not submit proposed findings of fact and conclusions of law or request the same from the circuit court. Without a record setting forth the grounds supporting the motion, we deem this issue waived. Regardless, we further conclude the court's failure to issue the necessary findings was harmless because the evidence admitted was cumulative to evidence properly received.

[¶73.] The court also did not abuse its discretion or commit prejudicial error by refusing to declare certain witnesses adverse. Additionally, Rodriguez's Sixth Amendment rights were not violated, and there is sufficient evidence to support his guilty verdict on all counts. We affirm.

[¶74.] GILBERTSON, Chief Justice, and JENSEN, SALTER, and DEVANEY, Justices, concur.