#29537-r-JMK
**2022 S.D. 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                   Plaintiff and Appellee

v.

CHRISTOPHER MICHAEL ALEXANDER,          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

SARAH L. THORNE
Assistant Attorney General
Pierre, South Dakota                     Attorneys for plaintiff and
                                         appellee.


MANUEL J. DE CASTRO, JR.
Madison, South Dakota                    Attorney for defendant
                                         appellant.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 4, 2021
OPINION FILED **06/01/22**

#29537

KERN, Justice

[¶1.] Christopher Alexander owns a Rottweiler and two pit bulls. His neighbor, Michael Baartman, had contact with the two pit bulls on March 4, 2020, which culminated in Alexander being convicted of violating SDCL 40-1-23 for having a "potentially dangerous animal." Although the circuit court convicted Alexander of the charge following a bench trial, the court expressed concern regarding the lack of due process in determining whether the animals were dangerous as defined in SDCL 40-1-1(5), a requirement for a conviction under SDCL 40-1-23. Alexander appeals the sufficiency of the evidence supporting his conviction. We reverse.

**Factual and Procedural Background**

[¶2.] Alexander and his girlfriend, Sierra Cundy, lived together with Alexander's mother in Chester, South Dakota, from December 2019 through March 4, 2020. Their next-door neighbor was Baartman. Alexander and Cundy had three dogs—one Rottweiler and two pit bulls.

[¶3.] On December 17, 2019, the first incident between Baartman and Alexander's dogs took place. Alexander was not at home, but Cundy was home and out in the yard. Baartman was walking from his garage to his vehicle when Alexander's Rottweiler ran toward Baartman. The Rottweiler stopped approximately two feet away from Baartman and, according to Baartman, was growling with its hair standing up on its back and with its teeth showing. Baartman kept slowly walking toward his vehicle and, when he came into the view

-1-

of Cundy, who was standing in her and Alexander's yard, she called for the dog to come back to the yard and it obeyed her command.

[¶4.]      Baartman told Cundy that she needed to keep the dog on a leash. Baartman testified at Alexander's bench trial that he was "very scared of [the] dog" because he "thought it was going to take [him] down." Baartman subsequently asked law enforcement what he could do about the dog. The officer who spoke to Baartman is not definitively identified in the record, but Baartman testified he or she told him that all Baartman could do was carry a gun and shoot the dog if it attacked him. Deputy Grant Lanning testified at Alexander's bench trial that he spoke to Alexander on December 17 and advised him to keep his dogs contained and under control.

[¶5.]      On March 4, 2020, Baartman had a second encounter with Alexander's dogs. Alexander's two pit bulls ran up to Baartman while he was walking to his vehicle. Alexander again was not home, but Cundy was. First, Alexander's white pit bull ran up to Baartman, followed by Alexander's brown pit bull. Baartman was carrying a gun and pointed it at the dogs but did not shoot because Cundy and two of her children were outside in the yard. Cundy called for the dogs and they ran back to her. The encounter lasted a few seconds and was captured, but without audio, by the surveillance camera of a neighbor who lived across the street.

[¶6.]      Later in the day when Alexander learned what had happened with Baartman and the dogs, he called law enforcement and notified them that "Mr. Baartman pulled a gun on my dogs." Alexander stated that the situation needed to be taken care of or he would take matters into his own hands, threatening that

Baartman "would not need a hospital because he would be dead." Deputy Lanning then called Baartman to notify him of what Alexander had said.

[¶7.] Several Lake County Sheriff's Deputies arrived at Alexander's home the afternoon of March 4. They obtained surveillance camera footage of the incident from the neighbor across the street, issued Cundy, who was at home at the time, a ticket for keeping a "potentially dangerous animal," and impounded the dogs. Cundy subsequently pled guilty and paid the ticket.

[¶8.] Deputy Sarina Talich, who drove the dogs to Madison for impoundment, testified at the bench trial that the dogs growled and barked while she was transporting them in her car. After arriving at the pound, the dogs were removed from the car using a lasso tool and moved into kennels, during which process they barked and growled. Once the dogs were placed in kennels and the other dogs at the pound, who had become excited with the arrival of Alexander's dogs, settled down, Alexander's dogs calmed down as well.

[¶9.] Deputies met with Alexander at his home on the evening of March 4. After some discussion, they ticketed him for failure to restrain a dangerous animal, a Class 1 Misdemeanor, under SDCL 40-1-23. Alexander was subsequently charged by information with the single count of having a "potentially dangerous animal" on March 10, 2020. Alexander was arraigned on April 29, 2020, entered a plea of not guilty, and requested a trial.

[¶10.] The parties tried the case before the circuit court on December 15, 2020. After the evidentiary portion of the trial was complete, the court alerted the parties of its concern regarding the propriety of applying the definition of a

dangerous animal in SDCL 40-1-1(5) to a criminal charge under SDCL 40-1-23, stating, "I don't know [whether] that's constitutional or not. It certainly strikes the [c]ourt as backwards." The circuit court reasoned, "It actually makes the law enforcement officer—it's the only statute I know that does this—that makes the law enforcement officer the finder of fact. Not the court, not a jury." The court further stated that "I just think that that's a terrible standard, to let people involved in the situation, not an independent fact-finder, make that determination." The circuit court began this discussion with the statement that "these may be two of the worst-written statutes I've ever read, but they are presumed to be constitutional. So that's where I'm starting."

[¶11.] After analyzing the evidence, the circuit court found Alexander guilty as charged. As to the third element of the charge, in which the definition of dangerous animal in SDCL 40-1-1(5) was used to determine if Alexander's dogs were dangerous, the circuit court stated that "[m]y finding that the animals are potentially dangerous is based strictly on the finding of the officer that the animal was potentially dangerous, which is what the statute says." Additionally, the court stated that "if that wasn't the standard, I would have acquitted. And being clear on the record, is that the video [from the neighbor's surveillance camera]—there's no way for me to tell in that video if the animals are dangerous." Alexander was sentenced that same day to five days in the Lake County Jail, suspended, and ordered to pay restitution of $1,755 for the impoundment of his dogs. He was also ordered to have no contact with Baartman. A judgment of conviction was signed and filed on January 11, 2021.

[¶12.]      Alexander filed a notice of appeal on February 8, 2021, raising one issue which we restate as follows: whether the evidence presented at trial was sufficient to support his conviction for violation of SDCL 40-1-23 for keeping a "potentially dangerous animal."

## Standard of Review

[¶13.]      Whether there is sufficient evidence "to sustain a conviction is reviewed de novo." *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814. We consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). When reviewing a conviction rendered in a bench trial, "this Court defers to the [trial] court, as fact finder, to determine the credibility of witnesses and the weight to be given to their testimony." *State v. Rodriguez*, 2020 S.D. 68, ¶ 55, 952 N.W.2d 244, 260 (citation omitted).

## Analysis and Decision

[¶14.]      To prove the charge of keeping a "potentially dangerous animal" under SDCL 40-1-23, the State must prove, beyond a reasonable doubt, that (1) the defendant was the owner or caretaker of the animal, (2) the animal was not in a proper enclosure or confined or restrained, and (3) the animal was dangerous. SDCL 40-1-23 provides:

> The owner or caretaker of a potentially dangerous animal shall keep such animal in a proper enclosure. If a potentially dangerous animal is not in a proper enclosure, it shall be directly accompanied by its owner or caretaker and confined or restrained in such a manner that, after investigation by the board, any peace officer, or any officer or agent of a humane

society, it is not a dangerous animal. The ownership or possession of a dangerous animal in violation of this section is a Class 1 misdemeanor.

SDCL 40-1-1(5) defines a dangerous animal for purposes of element (3) as "any animal that, by itself or by environmental circumstances, at the determination of the board, any agent or officer of a humane society, or any law enforcement officer, is a threat to the physical well-being of other owned animals or humans[.]"

[¶15.] Neither party disputes that the dogs were not in an enclosure, confined, or restrained. Although Alexander contends that because he was not home during the March 4 incident, he cannot be criminally responsible, the statute requires only that he be the owner or caretaker of the animal. Here, the circuit court determined that Alexander owned the dogs based on his statement to law enforcement that the dogs were "my dogs." The evidence produced supports the court's determination that elements (1) and (2) of SDCL 40-1-23 were proven at trial.

[¶16.] As to element (3), SDCL 40-1-1(5) provides in pertinent part that an animal is dangerous if "any law enforcement officer" determines that the animal "is a threat to the physical well-being of other owned animals or humans[.]" The court stated that its finding of dangerousness was "based strictly on the finding of the officer that the animal was potentially dangerous" and that "if that wasn't the standard, I would have acquitted."* We agree with the circuit court's initial

---

* The concurrence in result asserts that "there was no determination that Alexander's dogs were dangerous animals within the definition of SDCL 40-1-1(5)." However, the concurrence in result ignores the law enforcement determination that the dogs were dangerous in that law enforcement ticketed

(continued . . .)

-6-

impression of the statute and conclude that this evidence is not sufficient to support a conviction under SDCL 40-1-23.

[¶17.] Alexander argues that the testimony from law enforcement officers and the video admitted at trial support his theory that the dogs were not dangerous. Alexander contends that the video showed that the dogs ran up to Baartman and then ran away a few seconds later. Alexander emphasizes that there is no dispute regarding the accuracy of this depiction in the video as confirmed by Baartman and the law enforcement officers who testified regarding the video. Alexander further argues that the only law enforcement officer who testified to having interacted with the dogs, Deputy Talich, "did not testify that she believed the dogs to be a threat to other owned animals or humans . . . ." The State responds that, under SDCL 40-1-1(5), it was only required to prove that a law enforcement officer made a determination that the dogs were dangerous, which occurred when law enforcement officers wrote Alexander the ticket for failing to restrain a dangerous animal. The State also relies in its brief before this Court on the testimony by law enforcement regarding their investigation of the incident and Deputy Talich's observation of the dogs' behavior as she transported the dogs to the pound as evidence supporting the dogs' dangerousness.

[¶18.] In Alexander's case, neither party, nor the circuit court, cited *City of Pierre v. Blackwell*. In *Blackwell*, an animal control officer determined that Blackwell's dog was dangerous, and, on the basis of that determination, Blackwell

---

(. . . continued)
Alexander for failing to restrain a *dangerous* (not *potentially dangerous*) animal.

was convicted for failing to comply with certain requirements that a City of Pierre ordinance imposed upon owners of animals declared by an animal control officer to be dangerous. 2001 S.D. 127, ¶¶ 16–17, 635 N.W.2d 581, 586–87. This Court held that Blackwell was not afforded due process when he was convicted based on the animal control officer's determination of dangerousness. *Id.* ¶ 17, 635 N.W.2d at 587. Although the Court determined that the city ordinances under which Blackwell was convicted afforded due process to owners of animals subject to the regulations, the Court concluded that the circuit court erred by "merely review[ing] the animal control officer's decision for its legality" rather than making an "independent determination of dangerousness by a neutral judicial officer as part of the criminal proceeding." *Id.* ¶¶ 16–18, 635 N.W.2d at 586–87. The Court therefore reversed Blackwell's conviction because he was deprived of his right to have the State prove the dog was a dangerous animal beyond a reasonable doubt and remanded the matter for further proceedings. *Id.* ¶ 18, 635 N.W.2d at 587.

[¶19.]     *Blackwell*, although decided on due process grounds, is instructive in this case in that an officer's sole determination that an animal is dangerous does not suffice to prove that an animal is dangerous beyond a reasonable doubt in a criminal proceeding implicating due process rights. Rather, a neutral factfinder must conclude from the evidence presented at trial whether the animal is dangerous for purposes of satisfying the third element of SDCL 40-1-23. In this case, the circuit court did not make this required finding and instead expressed that it considered itself bound by the officer's determination of dangerousness because the language of the statute appears to require nothing further. The circuit court noted

that if the definition of a dangerous animal as provided in SDCL 40-1-1(5),
requiring only an officer's determination that the dogs were dangerous, "wasn't the
standard, *I would have acquitted*." (Emphasis added.) Because *Blackwell*
mandates that due process requires a higher standard than that stated in SDCL 40-
1-1(5) to prove the dangerousness of an animal in a criminal proceeding, and
because the circuit court clarified that it would have acquitted but for the SDCL 40-
1-1(5) language, we reverse Alexander's conviction.

[¶20.]		DEVANEY and MYREN, Justices, concur.

[¶21.]		JENSEN, Chief Justice, and SALTER, Justice, concur in result.

SALTER, Justice (concurring in result).

[¶22.]		I agree that there is insufficient evidence to sustain Alexander's
conviction for violating SDCL 40-1-23. The statute criminalizes possession of a
dangerous animal—not a potentially dangerous one. A dangerous animal is one
that has been determined to be "a threat to the physical well-being of other owned
animals or humans[.]" SDCL 40-1-1(5). This determination can be made by "the
board, any agent or officer of a humane society, or any law enforcement officer[.]"
*Id.*

[¶23.]		Here, there was no determination that Alexander's dogs were
dangerous animals within the definition of SDCL 40-1-1(5). Therefore, the State
failed to present any proof on this element of SDCL 40-1-23, and Alexander's
misdemeanor conviction should be reversed. The circuit court's reliance upon the
officer's post-seizure opinion of the dogs' dangerousness is problematic, as the court
suspected, but not simply because it ultimately treated the testimony as dispositive.

What makes the conviction unsustainable is the absence of an *earlier* determination that the dogs were dangerous animals.

[¶24.]    For this reason, I think it is unnecessary to rely upon our decision in *Blackwell*. And it may also be unwise to do so. I am concerned that our opinion in *Blackwell* may have confused the question of whether a dog was objectively dangerous with whether the dog was a "dangerous animal." The latter was the actual element there, as it is here, and I tend to think "dangerous animal" is a status—as evidenced by its specific definition in SDCL 40-1-1(5)—to be determined before a person can be subjected to criminal liability, not after.

[¶25.]    But any further discussion in this regard is best left for another day because we can and should reverse the conviction here without regard to *Blackwell*.

[¶26.]    JENSEN, Chief Justice, joins this writing.