#29283-a-JMK
**2021 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

AARON DUSTIN REEVES,                     Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE NATALIE D. DAMGAARD
Judge

\* \* \* \*

CHRISTOPHER MILES of
Minnehaha County Public
   Defender's Office
Sioux Falls, South Dakota                     Attorneys for defendant and
                                           appellant.

JASON R. RAVNSBORG
Attorney General

SARAH L. THORNE
Deputy Attorney General
Pierre, South Dakota                     Attorneys for plaintiff and
                                           appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
JANUARY 11, 2021
OPINION FILED **11/17/21**

#29283

KERN, Justice

[¶1.]        Following a jury trial, Aaron Reeves was convicted and sentenced for assault by a jail inmate – contact with bodily fluids, simple assault against an inmate, and threatening a law enforcement officer.  Reeves appeals, alleging that the circuit court abused its discretion by admitting a surveillance video into evidence, prejudicing the outcome of his trial.  We affirm.

## Facts and Procedural History

[¶2.]        On December 2, 2017, a verbal disagreement broke out between inmates Reeves and Daniel Clapper in F-Block of the Minnehaha County Jail, resulting in Reeves striking Clapper on the head.  Correctional Officer Hemenway arrived at the scene and escorted Reeves into the "fishbowl," a small soundproof room with windows on every side used for meetings between attorneys and their clients.  Reeves pushed Officer Hemenway backwards and gained the upper hand over him.  In response, several officers entered the room to restrain Reeves.  During the ensuing scuffle, Reeves was taken to the ground, injuring his nose which began to bleed.  Once restrained, Reeves was physically compliant and escorted to the J-block (lockdown block).  Throughout the walk to J-block, Reeves was verbally abusive, yelling and screaming at the officers.  Once inside the lockdown block, Sergeant Kurt Schaunaman, who had not been involved in the earlier altercation, attempted to speak to Reeves about what had occurred downstairs.  Reeves spit blood and saliva in Sergeant Schaunaman's face and onto his shirt.  Sergeant Schaunaman had not touched Reeves prior to the time Reeves spit on him.  Reeves

-1-

was then pressed against the wall, placed in a restraint chair, and a spit mask was placed over his head to prevent further spitting incidents.

[¶3.] In May 2018, Reeves was indicted by a Minnehaha County grand jury and charged with count 1, assault by adult jail inmate – contact with bodily fluids in violation of SDCL 22-18-29; count 2, simple assault – attempts to cause with ability to cause bodily injury in violation of SDCL 22-18-1(1) for the alleged offense against inmate Clapper; and count 3, threatening a law enforcement officer or a member of the officer's immediate family in violation of SDCL 22-11-15.5. The State filed a part II information alleging that Reeves had two prior convictions for simple assault.

[¶4.] The case was tried before a jury on April 23, 2019. The State called three witnesses to testify at trial: Corporal Chris Butcher, Corporal Kevin Keegan, and Sergeant Schaunaman. Corporal Butcher testified that he was advised of the initial disturbance and arrived in the area of the fishbowl just as Reeves was pushing Officer Hemenway over. Corporal Butcher testified to how Reeves was restrained outside of the fishbowl and how Reeves was transported to J-block. Once at J-block, Corporal Butcher testified that he heard Reeves threaten the officers and saw Reeves spit blood on Sergeant Schaunaman's face and shirt. Corporal Butcher took several photographs of the blood on Sergeant Schaunaman's person, which were offered and received into evidence.

[¶5.] Corporal Keegan testified that he is the supervising officer responsible for investigating incidents that occur at the Minnehaha County Jail to determine if criminal charges are warranted or if outside agencies need to be brought in to assist

with an investigation. Accordingly, he was assigned to investigate the altercation involving Reeves. As part of his investigation, Corporal Keegan reviewed the reports generated by other officers regarding the incident and the video footage captured by the jail's video surveillance system, which runs 24 hours a day. Corporal Keegan explained that multiple cameras were located throughout the jail that recorded activities within each cell block. The video footage, which did not include sound, was stored on a secured server accessible only by supervisors. Corporal Keegan viewed the video of the initial incident between Reeves and Clapper and placed it on a DVD which the State marked and offered as Exhibit 1.

[¶6.] Reeves requested and received the opportunity to voir dire Corporal Keegan in front of the jury to inquire regarding the foundation for the exhibit. During this examination, Corporal Keegan admitted that he was not present at the time of the altercation, and his knowledge of what had occurred was obtained from other people who were present and from viewing the video footage. Reeves objected to the admission of the DVD containing the footage based on a lack of foundation, irrelevance, and hearsay.

[¶7.] The court recessed the jury and heard the parties' arguments in chambers regarding the admissibility of the exhibit. Reeves argued that because the State was not calling Clapper to testify, the video could not provide adequate context regarding what occurred between the two inmates before and after the altercation. Additionally, Reeves argued that because Corporal Keegan was not present during the altercation, he was unable to testify whether the video was a fair and accurate depiction of the altercation. The circuit court overruled the objections,

concluding the video was relevant and not hearsay. Further, the court found that the State had established sufficient foundation for the video by showing that it was captured by the jail's camera system; stored on a secure server; had not been altered in any fashion; and was accessible only by supervisors. Regarding Reeves' objection to the foundation for the video, arguing that the incident lacked "context," the court reasoned that "context" was not "part of the foundational inquiry" and found this argument relevant to the weight of the evidence rather than to its admissibility. The court permitted the State to play the video before the jury.

[¶8.] As its final witness, the State called Sergeant Schaunaman to testify about his interactions with Reeves. Sergeant Schaunaman explained that after Reeves was brought to J-block, he called for medical staff to check on the wound to Reeves' nose and called for staff to get the restraint chair. He spoke with Reeves, urging him to comply with staff directives to avoid being put in the restraint chair. Reeves responded by spitting blood and saliva at him, which sprayed over his face and shirt. During the process of restraining Reeves and placing him in a spit mask, Reeves threatened the officers, telling them in part that when he saw them on the street, "your heads will be buried in the ground, and you'll be lucky if it's attached to your body . . . . You won't have any ribs left, because they will all be in pieces." As part of the jail's standard protocol, officers used a handheld camcorder to record the officers' actions while placing Reeves in restraints. Sergeant Schaunaman testified that the camcorder recorded the video onto an SD card, and the video on the SD card was saved and stored on a computer on a secured server at the jail. Having previously watched the video, Sergeant Schaunaman confirmed that it was

a fair and accurate representation of the incident. The State offered the video and it was received without objection.

[¶9.] At the close of the evidence, Reeves moved for judgment of acquittal on counts 2 and 3. The circuit court denied the motion and the case was submitted to the jury which convicted Reeves on all counts. Thereafter, the State dismissed the part II information. In February 2020, Reeves appeared before the circuit court for sentencing. For count 1, the court sentenced Reeves to serve two years in the state penitentiary with one year suspended on conditions. For counts 2 and 3, the court imposed one-hundred-eighty-day jail sentences, all suspended, to be served consecutively to each other and to count 1.

[¶10.] Reeves appeals, raising one issue: whether the circuit court abused its discretion to his prejudice when it admitted the surveillance footage of the incident between Clapper and Reeves into evidence.

### Standard of Review

[¶11.] Evidentiary rulings are reviewed for an abuse of discretion and are presumed to be correct. *State v. Stokes*, 2017 S.D. 21, ¶ 12, 895 N.W.2d 351, 354 (citations omitted). "An abuse of discretion occurs when the circuit court exercises its discretion to an end or purpose not justified by, and clearly against reason and evidence." *State v. Berget*, 2014 S.D. 61, ¶ 13, 853 N.W.2d 45, 52 (quotation marks omitted) (citation omitted). To necessitate reversal, "not only must error be demonstrated, but it must also be shown to be prejudicial." *State v. Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d 721, 727 (citation omitted). An error is prejudicial when

"in all probability [the error] produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Id.* (citation omitted).

### Analysis and Decision

[¶12.]    Reeves contends that the circuit court abused its discretion in admitting the jail's surveillance video because proper foundation was not laid to authenticate the video. SDCL 19-19-901(a) governs authentication of evidence, stating, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." SDCL 19-19-901(b) provides a non-exhaustive list of examples that satisfy the 901(a) requirements. SDCL 19-19-901(b)(1) provides that testimony of a witness with knowledge may be used to show that an item is what it is claimed to be. SDCL 19-19-901(b)(9) provides the additional example that "[e]vidence describing a process or system and showing that it produces an accurate result" may also be used to lay an authentication foundation.

[¶13.]    Reeves contends that, for the video of the altercation between Clapper and Reeves to be admitted properly, Corporal Keegan was required to lay foundation under SDCL 19-19-901(b)(1) that the cameras functioned properly, the operator was competent in operating the equipment, and the recording fairly and accurately represented the scene depicted. Reeves contends that because Corporal Keegan was not present during the altercation, he is unable to verify that the recording fairly and accurately represented the scene depicted; therefore, he cannot lay proper foundation to authenticate the video. In response, the State contends

that Corporal Keegan did not need to be present during the altercation to lay the necessary foundation. The State argues that Corporal Keegan only needed to explain how the camera system worked, that the method to store the video was reliable, that he was competent in retrieving the video from the server, and that the video offered was a fair and accurate representation of the video he retrieved from the server. By meeting these requirements, the State argues that Corporal Keegan's testimony met the foundational authentication requirements under SDCL 19-19-901(b)(9).

[¶14.] We have not previously addressed the foundational requirements for admitting video footage under SDCL 19-19-901(a) when a human operator is not available to testify to the accuracy of the scene depicted in the video. *See State v. Lohnes*, 432 N.W.2d 77, 87 (S.D. 1988) (holding that testimony of a "police officer who video taped the crime scene" satisfied foundational requirements); *State v. Dunkelberger*, 2018 S.D. 22, ¶ 12, 909 N.W.2d 398, 400 (holding the defendant's admission to what was depicted on the video satisfied the foundational requirements). With the increasing number of automated and motion sensor cameras being used at homes and businesses, we take this opportunity to address the foundational requirements for admitting photographs and videos not recorded by a human operator. In many instances, a person cannot authenticate that an automatically recorded video fairly and accurately depicts the relevant interaction that the video recorded because the video was recorded without a human operator witnessing the event. However, a person's inability to testify regarding what is depicted does not mean that the video is inaccurate—instead, it means that

technology has changed to the degree that we must consider a different method through which automatically recorded video and photographs can be authenticated.

[¶15.] Under the traditional theory underlying authentication of photographic or video evidence, the photograph or video is viewed as "merely illustrative of a witness' testimony," and the evidence "only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation." *Midland Steel Prods. Co. v. U.A.W. Local 486*, 573 N.E.2d 98, 129 (Ohio 1991). In contrast, under the silent witness theory, a photograph or video is "a silent witness which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Id.* at 130 (citations omitted). Through the silent witness theory, "recordings such as a tape from an automatic surveillance camera can be authenticated as the accurate product of an automated process, satisfying the foundation required by Federal Rule of Evidence 901(b)(9)." 2 McCormick On Evidence § 216 (Robert P. Mosteller ed., 8th ed. 2020). SDCL 19-19-901(b)(9) is identical to Federal Rule of Evidence 901(b)(9), which provides that evidence may be authenticated by "[e]vidence describing a process or system and showing that it produces an accurate result."

[¶16.] Although we have not yet had occasion to analyze the foundational rules for authenticating automatic video distinctly from a video recorded by a human actor, many courts across the nation have implemented the silent witness theory to hold that photographs and videos may be admitted into evidence without foundation from a witness who took the photograph or video. *See, e.g., U.S. v.*

*Rengifo*, 789 F.2d 975 (1st Cir. 1986); *State v. Stangle*, 97 A.3d 634 (N.H. 2014);

*State v. Luke*, 464 P.3d 914 (Haw. Ct. App. 2020).* However, "jurisdictions differ on

what evidentiary showing is required to satisfy the 'silent witness' standard."

*Stangle*, 97 A.3d at 637. Generally, there are two categories of approaches

employed. Some states implement a flexible, fact-based approach to allow a judge

to tailor the authentication process to the individual case; in contrast, others use

various "multi-factor test[s] for determining the admissibility of photographs or

videos." *Id.*

[¶17.] The New Hampshire Supreme Court addressed the silent witness

theory in *Stangle* and declined to adopt a formulaic, factor-based approach to

authentication. The Court reasoned that:

> it is not wise to establish specific foundational requirements for
> the admissibility of photographic [or video] evidence under the
> 'silent witness' theory, since the context in which the evidence
> was obtained and its intended use at trial will be different in
> virtually every case. It is enough to say, that adequate
> foundational facts must be presented to the trial court, so that
> the trial court can determine that the trier of fact can
> reasonably infer that the subject matter is what its proponent
> claims. This allows the trial court to consider the unique facts
> and circumstances in each case—and the purpose for which the
> evidence is being offered—in deciding whether the evidence has
> been properly authenticated.

*Id.* at 638 (cleaned up). The Intermediate Court of Appeals of Hawaii similarly

adopted the more flexible approach to the silent witness theory in *State v. Luke*,

---

* *See also United States v. Harris*, 55 M.J. 433, 438–39 (C.A.A.F. 2001)
(applying the silent witness theory in a military court setting); *State v.
Haight-Gyuro*, 186 P.3d 33 (Ariz. Ct. App. 2008); *People v. Dennis*, 956 N.E.2d
998 (Ill. App. Ct. 2011); *Kindred v. State*, 524 N.E.2d 279 (Ind. 1988); *State v.
Moyle*, 532 S.W.3d 733 (Mo. Ct. App. 2017); *State v. Anglemyer*, 691 N.W.2d
153 (Neb. 2005); *State v. Snead*, 783 S.E.2d 733 (N.C. 2016).

allowing trial courts to tailor the means of authenticating the relevant video to the facts of the case, assigning certain facts to bear on the admissibility of the evidence and others on the weight of the evidence depending on their importance to the case and the authenticity of the evidence at hand. 464 P.3d at 925–27.

[¶18.]     Many recording devices do not require an operator to take photographs or video footage. If we were to require authentication testimony that the footage or photograph fairly and accurately reflects the events depicted, it would often be difficult to introduce otherwise reliable photographs and video footage obtained from unmanned cameras. Because excluding reliable, relevant evidence does not further the interests of justice, and for the reasons stated by the *Stangle* and *Luke* Courts, we adopt the flexible, fact-based approach to the silent witness theory of authentication. We hold that to authenticate a photograph or video under the silent witness theory, the proponent must present sufficient foundational facts to the circuit court so that the court, in its discretion, "can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims." *Stangle*, 97 A.3d at 638 (citation omitted). This is ultimately consistent with the requirements of SDCL 19-19-901(a).

[¶19.]     The flexible, fact-based rule we adopt today permits the party offering the evidence, and the party against whom it is offered, a fair opportunity to address with the circuit court whether sufficient foundational evidence has been presented to authenticate a particular photograph or video. If a circuit court determines that there is adequate foundation for the admissibility of the video, any further "concerns that the defendant ha[s] regarding the surveillance procedures, and the

method of storing and reproducing the video material, [are] properly the subject of cross-examination and affect[ ] the weight, not the admissibility, of the video." *Stangle*, 97 A.3d at 639 (quotation marks omitted) (citation omitted).

[¶20.]    Here, Corporal Keegan testified regarding the manner in which the videotape was made, explaining that the jail had multiple cameras recording footage 24 hours a day, and one of those cameras recorded the fight involving Reeves and Clapper.  Corporal Keegan's testimony described the location of each of the cameras and how and where the footage from the cameras was stored.  Additionally, Corporal Keegan testified that the video fairly and accurately portrayed the area at the time it was taken.  The circuit court noted that it believed the videotape was not altered in any way, which was supported by the fact that Corporal Keegan personally retrieved the videotape footage from a secure server that was only accessible to supervisors.  Corporal Keegan's testimony adequately supports the circuit court's finding that the video was an accurate recording of the fight involving Reeves on the date and time alleged.

## Conclusion

[¶21.]    Based on the foregoing, the circuit court did not abuse its discretion in admitting the videotape.  Corporal Keegan's testimony was sufficient to authenticate the video under SDCL 19-19-901 and the silent witness theory.

[¶22.]    JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.