#29902-a-SRJ
**2023 S.D. 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                      Plaintiff and Appellee,

    v.

RAMON DERON SMITH,
a/k/a RAMON A. SMITH,
a/k/a RAMON SADDLER,                         Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRADLEY G. ZELL
Retired Judge

* * * *

MANUEL J. DE CASTRO JR.
Sioux Falls, South Dakota                    Attorney for defendant
                                              and appellant.


MARTY J. JACKLEY
Attorney General

STEPHEN G. GEMAR
Assistant Attorney General
Pierre, South Dakota                         Attorneys for plaintiff
                                              and appellee.

* * * *

ARGUED
MARCH 23, 2023
OPINION FILED **07/12/23**

JENSEN, Chief Justice

[¶1.]    A Facebook feud involving Ramon Smith's (Smith) sister, her girlfriend, and another family led to a series of altercations that culminated in Smith firing a weapon, killing a bystander and wounding two others.  Smith claims he acted in self-defense.  Following a jury trial, he was convicted and sentenced for second-degree murder and three counts of aggravated assault.  Smith appeals, arguing that he was entitled to a pretrial determination of statutory immunity under SDCL 22-18-4.8, a statute which became effective during the pendency of his case.  He also argues that the circuit court abused its discretion by receiving evidence that he could not legally possess a firearm, erred by not granting a judgment of acquittal, and abused its discretion by not granting a mistrial.  We affirm.

## Background

[¶2.]    In the early morning hours of June 8, 2019, Smith, a resident of Minneapolis, arrived in Sioux Falls with his sister, Martece Saddler (Martece), and her girlfriend, Christina Haney (Christina).  Smith did not know the area or have social connections beyond Martece.  He planned to visit them for a few days, help them assemble some new furniture, and purchase their old Buick since they had purchased a newer vehicle.  Smith, Martece, and Christina went to the parking lot of the Pave bar around closing time, hoping to find an afterparty.  There they exchanged words with the Williams sisters, Darneisha and Deidra, regarding an ongoing Facebook feud.  Martece and Christina had been arguing on social media with Jasmine Allen (Jasmine) and Paris McAbee (Paris), daughter and mother,

-1-

respectively, who formerly had been close mutual friends of Martece, Christina, Darneisha, and Deidra but remained on good terms with Darneisha only. Smith, Martece, Christina, and Deidra found a party, but they did not stay long and soon returned to Christina's apartment at 120 North Cliff Avenue.

[¶3.] Later that morning, Jasmine came to Christina's apartment complex and was shouting in the parking lot. Christina's mother, Tenessa Carr (Tenessa), lived in another apartment in the same complex with her husband, Larry Carr Jr. When Tenessa heard Jasmine yelling Christina's name, she called Christina to tell her that a woman was yelling her name. Christina knew Tenessa was talking about Jasmine based on the physical description Tenessa provided and the interaction Christina had had with Darneisha the night before, but Christina did not seem concerned.

[¶4.] A short while later, Christina, Martece, and Deidra drove to Jasmine and Paris's apartment. Smith accompanied them but drove separately. The women went inside the building, found that Jasmine and Paris were not there, and argued with Jasmine's brother Joseph Allen (Joseph). He shut the door on them. Once back outside the building, Martece kicked in a window fan and continued shouting at Joseph.

[¶5.] Martece, Christina, and Smith returned to Christina's apartment, and Christina's brother, Larry Carr III (LJ), joined them. Christina testified that she received a Snapchat video from Joshua Allen (Josh), a brother of Jasmine and Joseph, that depicted Joseph holding a gun and making threats. She also claimed to have received messages that said, "No, b****. Answer my calls. Come outside[.]"

She showed these to Martece, Smith, and LJ, but they did not initially take them as a serious threat.[1]

[¶6.]	Meanwhile, a group of young men that included Jasmine's brothers Joseph, Josh, Jevon Allen (Jevon), and Zykey Richardson, along with Devejuan Brown-Norris (Devejuan) and others, met up at a fast-food restaurant. At about 1:00 p.m., the group proceeded to Christina's apartment complex in reaction to Christina, Martece, Deidra, and Smith having been at Jasmine's. They left their cell phones behind, parked their vehicles around the block, and approached on foot. LJ testified that Smith grabbed a gun that was tucked in the futon cushions and put it in his pants when they observed the young men enter the parking lot. Josh and Joseph entered the building and began kicking and pounding on Christina's apartment door, yelling for those inside to come out. They left the building and returned to the parking lot in under a minute.[2] LJ testified that Smith said that "if he went outside he was going to start shooting."

[¶7.]	Looking out at the parking lot from his apartment, Larry recognized Devejuan, a coworker, and went out to speak with him. LJ saw Larry outside and

---

1.	LJ testified that he did not recall the Snapchat video or messages. They are not in the record. *See State v. Bariteau*, 2016 S.D. 57, ¶ 8 n.1, 884 N.W.2d 169, 172 n.1 ("Snapchat is an image messaging mobile phone application in which a user can send a photograph or text message with a set time to expire. The receiving user can only view the text message or photograph for one to ten seconds before the image or text message expires and is automatically deleted from the mobile phone.").

2.	Daquan Holmes also entered the building after them but quickly exited. In an interview, Smith told law enforcement that those in the apartment were scared and hid in the bedrooms. Christina testified that LJ and Smith were scared and got down on the ground when they heard the banging on the door. However, LJ testified that no one called the police or hid in the bedrooms.

left Christina's apartment to try and get him to go back inside. LJ initially told law enforcement he was concerned about his father being with the group outside but testified at trial he was afraid of what Smith might do. LJ testified that Josh was mad and shouting Christina's name and yelling for her to come outside. LJ did not see anyone with a weapon, and no one threatened him while he was in the parking lot.

[¶8.]     Before LJ could get Larry to return to his apartment, Smith exited the building. Josh moved toward Smith and began yelling. Christina testified that she observed from her apartment window that Smith's hands were up and that he said he just wanted to talk when Josh rushed him.[3] In his interview with law enforcement, Smith also claimed his hands were up. Others testified that Smith's hands were not up.[4] A surveillance video from a nearby business does not show a clear image of Smith's hands before the shooting. The video shows some of the young men who had been on a retaining wall at the edge of the parking lot stood when the shouting between Smith and Josh began. It also shows Josh adjusting the waistband of his shorts, which Smith claims to have perceived as Josh reaching for

---

3.    When the State called Tenessa back to the stand to impeach Christina's testimony, she testified that Christina had changed her story. According to Tenessa, Christina had previously said that she sent LJ out to bring Larry back in "because [Smith] had said that he was going to shoot everybody out there if he had to go out there" and that she tried to hold Smith back when he went out. Notably, while testifying, Christina referred to Martece, Smith's sister, as her fiancée and indicated that she was still in a relationship with her at the time of trial.

4.    Accounts also differed as to whether Smith was yelling about why so many men showed up because of a "girl fight[,]" if Josh or others were yelling about having guns, or if they were yelling about Smith being identified as someone who was at Paris's apartment earlier.

a weapon. Smith opened fire when Josh was approximately nineteen feet away. Smith shot Jevon in the head, Josh in the shoulder, and Larry in the abdomen. For the most part, the young men took off running and scattered. Devejuan did not turn his back to Smith or run.

[¶9.] There were several third-party witnesses. A landscaper working in a neighboring yard noticed the people gathering in the parking lot. When he was in his skid loader and starting it, he heard a loud noise that he initially thought was the skid loader backfiring but soon realized was shooting. He observed Smith "coming out of the apartment building just shooting all around us and everybody scrambling." He hid behind his skid loader, but made eye contact with Smith, whom he then saw fire the gun "across Cliff Avenue as a few of the guys were like scrambling" out of the parking lot. He watched Smith jump into his car and take off and then called 911. Another neighbor who had been looking out the window and washing dishes when the shooting began also called 911. He reported seeing the dark car Smith was driving as he left the scene.

[¶10.] Tenessa saw from the window that her husband was in pain and that he had been shot. She told her younger son to call 911. Then she went outside to ask Devejuan to drive Larry to the hospital. She encountered Smith before he left the scene and told him he had shot her husband. He replied to the effect that he did not know he had done this.

[¶11.] Smith left the gun in the parking lot and drove away in the dark-colored Buick. Martece retrieved the gun, put it in a backpack, and gave it to LJ to hide. Christina found her keys before Tenessa found her keys to give to Devejuan.

Christina drove Larry to the hospital and then returned to her apartment. Larry died two days later. The other two men were hospitalized but survived their injuries.

[¶12.] When law enforcement arrived to secure the apartment, Martece and Christina refused to cooperate. Law enforcement collected evidence from the scene of the shooting, including an unloaded weapon in a closed satchel that Jevon had been wearing. They also recovered casings from the parking lot and projectiles from a neighbor's yard. Police did not initially recover the gun used in the shooting.

[¶13.] When Martece and Christina were allowed to leave, they drove to Minneapolis, meeting Smith along the way. Martece and Christina were later apprehended in Idaho on material witness warrants. Smith was arrested in Minneapolis twelve days after the shooting. He had cut his long hair in the meantime. Smith told law enforcement that he did not call the police when the group gathered outside the apartment complex because he was scared and that he went outside to diffuse the situation. He said he opened fire because an individual rushed toward him and appeared to reach for a weapon.

[¶14.] Weeks later, Christina contacted law enforcement and told them about the murder weapon. LJ and Tenessa brought the weapon, a .40 caliber semiautomatic handgun, to the police station.[5] After comparing test fires from this handgun with a bullet recovered from the neighbor's yard and the bullet recovered

---

5. LJ testified that he did not realize the gun was the one used to shoot his father when he hid it and that he was trying to save Christina from getting into trouble.

from Larry's abdomen during the autopsy, a forensic firearms examiner determined that both bullets had been fired from this gun.

[¶15.]    Smith was arraigned on a 19-count grand jury indictment charging various crimes, including second-degree murder, first-degree manslaughter, attempted first-degree murder, aggravated assault, reckless discharge of a firearm, possession of a firearm by a convicted felon, and committing or attempting to commit a felony with a firearm.  The State also filed a part II information alleging Smith had been convicted of three prior felonies.  He entered a plea of not guilty. Smith never disputed that he fired the shots that killed Larry and injured Josh and Jevon, but he consistently claimed that his actions were justified because he was acting in self-defense.  After SDCL 22-18-4.8 took effect on July 1, 2021, Smith moved to dismiss the indictment based on statutory immunity.  The circuit court denied his motion, and this Court declined Smith's petition for intermediate appeal.

[¶16.]    Prior to the start of trial, the circuit court severed the possession of a firearm by a convicted felon count for trial.  The State subsequently dismissed the count without prejudice.  The State also dismissed the attempted first-degree murder counts, some of the aggravated assault counts, the reckless discharge count, and the counts of committing or attempting to commit a felony with a firearm.  The State filed a notice of intent to offer Smith's felony status relative to his self-defense and moved to preclude Smith's self-defense claim, arguing he was unlawfully in possession of the firearm at the time of the shooting.  The circuit court denied the State's motion seeking to preclude Smith's self-defense claim but allowed the State to present testimony that Smith was statutorily prohibited from possessing a

firearm. The court granted Smith's motion in limine to exclude reference to or evidence of Smith's incarceration or recent release from prison.

[¶17.]     Consistent with the court's ruling, Detective Harris testified that Smith was statutorily prohibited from possessing a firearm under South Dakota law. The court instructed the jury immediately prior to this testimony that it could only consider this evidence as to the reasonableness of Smith's self-defense claim. As a part of the court's self-defense instructions, the jury was also told that an individual "prohibited from possessing a firearm can possess a firearm to defend himself if it is justified under the circumstances." Both the limiting instruction and the self-defense instructions indicated that the State would offer or had offered evidence that Smith had a prior felony conviction, which was the reason he was statutorily prohibited from possessing a firearm.

[¶18.]     During the State's examination of Christina, the prosecutor asked "[a]nd did something happen up in Minneapolis for [Smith] to come back with you?" She began to respond "[w]hen he had gotten out of prison --" when the prosecutor stopped her. After a bench conference, the court admonished the jury: "Ladies and gentlemen, you shall disregard the last comment of the witness in this matter. Remove it from your mind. It's not to be considered in any manner as it relates to the testimony of this witness for consideration in this matter." Smith moved for a mistrial at the next break. The court denied his motion, reasoning that the State did not intentionally elicit the testimony and the court had stricken the testimony and instructed the jury to disregard it. The court concluded it had no reason to

believe, despite this testimony, that the jury would be unable to consider the evidence according to the court's instructions.

[¶19.] Smith moved for a judgment of acquittal at the close of the State's case, which the court denied, explaining that the State had made a prima facie case for each count. The court also denied Smith's renewed motion at the close of his evidence. The jury returned a guilty verdict on all the remaining counts of the indictment. After the trial, Smith moved to set aside the verdict on sufficiency of the evidence grounds, which the court denied.

[¶20.] Smith admitted to three prior felony convictions in an amended part II information habitual offender charge. The court sentenced Smith to life in prison without the possibility of parole for the second-degree murder count and to three consecutive 25-year sentences for the aggravated assault (dangerous weapon) counts. The court did not impose sentences for the first-degree manslaughter count or the other aggravated assault counts.

[¶21.] Smith raises four issues on appeal, which we restate as follows:

1. Whether the circuit court erred in denying Smith's request for a statutory immunity hearing and in denying his motion to dismiss based on statutory immunity under SDCL 22-18-4.8.

2. Whether the circuit court abused its discretion by allowing the State to introduce evidence that Smith could not legally possess a firearm.

3. Whether the circuit court erred by denying the motions for judgment of acquittal.

4. Whether the circuit court abused its discretion by denying the motion for a mistrial.

## Analysis

### 1. Statutory immunity

[¶22.] "Issues of statutory . . . interpretation are questions of law. We review the interpretation and application of each de novo. In conducting statutory interpretation, 'we give words their plain meaning and effect, and read statutes as a whole.'" *State v. Bowers*, 2018 S.D. 50, ¶ 16, 915 N.W.2d 161, 166 (internal citations and quotation marks omitted) (quoting *Expungement of Oliver*, 2012 S.D. 9, ¶¶ 5–6, 810 N.W.2d 350, 351–52).

[¶23.] On March 21, 2021, HB 1212 was signed into law, creating SDCL 22-18-4.8.[6] After the statute became effective on July 1, 2021, Smith requested a statutory immunity hearing and moved for his case to be dismissed. The circuit court denied his request, determining that the statute did not apply retroactively because it was substantive in nature and the Legislature did not explicitly provide that it was to be applied retroactively. Smith filed an unsuccessful motion for reconsideration after another South Dakota circuit court resolved the question regarding the retroactivity of SDCL 22-18-4.8 differently. Smith also filed a petition with this Court for a discretionary appeal from the intermediate order, which we denied. Whether SDCL 22-18-4.8 applies retroactively presents an issue of first impression.

### a. Retroactivity of statute

[¶24.] The full text of SDCL 22-18-4.8 reads as follows:

---

6. SDCL 22-18-4.8 was amended in 2022 to clarify the burden of proof for a claim of immunity. The amendment also added a definition of criminal prosecution to include "arresting, detaining in custody, and charging or prosecuting the defendant."

> A person who uses or threatens to use force, as permitted in §§ 22-18-4 to 22-18-4.7, inclusive, is justified in such conduct and is immune from criminal prosecution and from civil liability for the use or threatened use of such force brought by the person against whom force was used or threatened, or by any personal representative or heir of the person against whom force was used or threatened, unless:
>
> > (1)(a) The person against whom force was used or threatened is a law enforcement officer, who was acting in the performance of official duties; and
> >
> > (b) The officer identified himself or herself; or
> >
> > (2) The person using or threatening to use force knew or reasonably should have known that the person was a law enforcement officer who was acting in the performance of official duties.
>
> The court shall award reasonable attorney's fees, court costs, compensation for loss of income, and all expenses incurred by a defendant in the defense of any civil action brought by a plaintiff, if the court finds that the defendant is immune from prosecution in accordance with this section.
>
> In a criminal prosecution, once a prima facie claim of self-defense immunity has been raised by the defendant, the burden of proof, by clear and convincing evidence, is on the party seeking to overcome the immunity from criminal prosecution provided for in this section.
>
> As used in this section, the term, criminal prosecution, includes arresting, detaining in custody, and charging or prosecuting the defendant.

[¶25.] In South Dakota, "[n]o part of the code of laws . . . shall be construed as retroactive unless such intention plainly appears." SDCL 2-14-21. "'[A] statute will not operate retroactively unless the act clearly expresses an intent to do so' or the change is merely procedural and not substantive." *State v. Krause*, 2017 S.D. 16, ¶ 16 n.7, 894 N.W.2d 382, 387 n.7 (alteration in original) (quoting *West v. John*

*Morrell & Co.*, 460 N.W.2d 745, 747 (S.D. 1990)). *See also* 73 Am. Jur. 2d *Statutes* § 229 (2023) ("A statute dealing with substantive rights should presumptively be given prospective application."). Since there is nothing in the statutory language about retroactive application, we must determine whether SDCL 22-18-4.8 was a procedural or substantive legislative change.

[¶26.] "As related to criminal law and procedure, *substantive law* is that which declares what acts are crimes and prescribes the punishment therefor; whereas *procedural law* is that which provides or regulates the steps by which one who violates a criminal statute is punished." *Krause,* 2017 S.D. 16, ¶ 16 n.7, 894 N.W.2d at 387 n.7 (quoting *State v. Sylva,* 804 P.2d 967, 969 (Kan. 1991)). *See also* 22 C.J.S. *Criminal Law: Substantive Principles* § 25 (2023) (citing Kansas authority to explain that retroactive application of a change to the criminal code is permissible only if it "merely alters the procedural aspects of the trial"); *Substantive Law*, Black's Law Dictionary (11th ed. 2019) (categorizing as substantive "[t]he part of the law that creates, defines, and regulates the rights, duties, and powers of parties").

[¶27.] Smith argues that if the Legislature did not intend retroactive application, it would have said so because it "knows how to include and exclude specific items in its statutes." *Sanford v. Sanford*, 2005 S.D. 34, ¶ 19, 694 N.W.2d 283, 289. He contends that even in the absence of clear language applying the statute retroactively, it applies retroactively because the statutory change is procedural rather than substantive. In support of his claim that the statute is not substantive, he highlights that SDCL 22-18-4.8 did not create a new affirmative

defense because South Dakota already recognized that individuals acting in self-defense need not retreat and that homicide may be justified when acting in defense of self or others. *See* SDCL 22-16-34 (repealed in 2021 by House Bill 1212); SDCL 22-16-35 (same); 2021 S.D. Sess. Laws ch. 93, § 15. His position is that "SDCL 22-18-4.8 leaves unchanged the current murder and affirmative defense statutes [and] only affects the *procedure* by which a State is able to seek a conviction."

[¶28.] For support, Smith cites *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky. 2009). In *Rodgers*, the events at issue occurred in 2004, and the relevant Kentucky law became effective in 2006, just before the defendant's trial. *Id.* at 749. Kentucky determined the immunity provision of its statute was procedural and therefore applied retroactively. *Id.* at 752-53. Smith also cites *Love v. State*, 286 So.3d 177 (Fla. 2019), which concluded that an amendment to Florida's Stand Your Ground Law that shifted the burden of proof was procedural and applied to all immunity hearings conducted after the effective date. *Id.* at 190. Smith asks for the verdict to be vacated and the case to be remanded for further proceedings to determine immunity under the statute.

[¶29.] The State responds that Smith's reliance on the absence of language indicating intent that SDCL 22-18-4.8 apply prospectively is misplaced because "[t]he general rule is that newly enacted statutes will not be given a retroactive effect unless such an intention is plainly expressed by the legislature." *Schultz v. Jibben*, 513 N.W.2d 923, 925 (S.D. 1994) (citing *Dahl v. Sittner*, 474 N.W.2d 897, 901 (S.D. 1991)). The State distinguishes *Love* because it dealt with a procedural amendment to the Florida Stand Your Ground law clarifying the burden of proof at

a hearing on immunity and did not "create any new substantive right." 286 So. 3d at 186. The State also contends that the Kentucky case Smith cites is inapposite because the underlying Kentucky caselaw distinguishing between substantive and procedural changes does not align with South Dakota's definitions of these terms. Finally, the State argues that any error by the circuit court in denying a pretrial immunity hearing was harmless because the jury ultimately rejected Smith's self-defense claim when it convicted him of second-degree murder.

[¶30.]        SDCL 22-18-4.8 provides that "[a] person who uses or threatens to use force, as permitted in 22-18-4 to 22-18-4.7,[7] . . . is justified in such conduct and is immune from criminal prosecution and civil liability for the use or threatened use of such force . . . ." SDCL 22-18-4.8 is more than just an affirmative defense to a crime; the immunity afforded by the statute is a legislative determination that justifiable homicide is not a crime subject to prosecution. The 2022 amendment further reflects the legislative intent to create a substantive right to be free from criminal culpability, including "arresting, detaining in custody, and charging or prosecuting the defendant[]" when a homicide is justifiable. *Id.* The statute also creates a cause of action in favor of an immune actor to be awarded "attorney's fees, court costs, compensation for loss of income, and all expenses incurred" arising from the successful defense of a civil action. *Id.*

[¶31.]        As the Florida Supreme Court explained under its similar immunity statute, "[w]hile Florida law has long recognized that a defendant may argue as an

---

7.    It is unnecessary to our decision to determine whether these statutes modified the existing law in South Dakota relative to justification for the use or threatened use of force.

affirmative defense at trial that his or her use of force was legally justified, [the immunity statute] contemplates that a defendant who establishes entitlement to the statutory immunity will not be subjected to trial." *Dennis v. State*, 51 So. 3d 456, 462 (Fla. 2010). The Florida immunity statute "expressly grants defendants a substantive right to not be arrested, detained, charged or prosecuted as a result of the use of legally justified force. The statute does not merely provide that a defendant cannot be convicted as a result of legally justified force." *Id. Love* contrasted the Florida Supreme Court's view of "[t]he 'substantive right to assert immunity' [that] was established in 2005[]" with its view that a more recent change to the burden of proof under the immunity statute was merely procedural. 286 So. 3d at 186 (quoting *Dennis*, 51 So.3d at 462). Unlike the substantive nature of the statutory grant of immunity, *Love* explained that the change to the burden of proof "does not alter the elements of self-defense, justifiable force, or any crime, nor does it alter the punishment for any crime. Instead, it alters the law 'which provides or regulates the steps by which[]' immunity determinations are made." *Id.* at 185 (internal citation omitted).

[¶32.] Smith's reliance on *Rodgers* to support his claim that the self-defense immunity statute was procedural is misplaced. Despite the acknowledgment that the Kentucky "General Assembly has made unmistakably clear its intent to create a true immunity, not simply a defense to criminal charges[,]" *Rodgers*, 285 S.W.3d at 753, the Kentucky court nonetheless concluded that the immunity statute merely "created a new procedural bar to prosecution[]" that could be applied retroactively. *Id.*

[¶33.]     *Rodgers'* treatment of a legislative grant of immunity as procedural rather than substantive is inconsistent with our decisional law in other contexts recognizing that a legislative grant of immunity is substantive in nature. For instance, in discussing the difference between a statute of limitations and a statute of repose, we have recognized that statutes of limitations are merely procedural bars to pursuing an action. Statutes of limitations "do not restrict or destroy the right to bring a cause of action . . . but rather, only establish the period of time in which a [party] must assert this right. 'A statute of limitations does not create or extinguish a right, but only places a limitation on a remedy which may be tolled or waived.'" *Green v. Siegel, Barnett & Schutz*, 1996 S.D. 146, ¶ 33, 557 N.W.2d 396, 405 (citation omitted). In contrast, we have held that statutes of repose "are based on considerations of the economic best interests of the public as a whole and are substantive grants of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists." *Pitt-Hart v. Sanford USD Med. Ctr.*, 2016 S.D. 33, ¶ 21, 878 N.W.2d 406, 414 (quoting *First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 866 (4th Cir. 1989)). "[S]tatutes of repose effect a legislative judgment that a defendant should 'be free from liability after the legislatively determined period of time.'" *Id.* (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 9, 134 S. Ct. 2175, 2183, 189 L. Ed. 2d 62 (2014)). We explained that this legislative grant of immunity in "'a statute of repose creates a substantive right to be free from liability . . . .' In other words, a statute of repose establishes a 'right not to be sued[.]'" *Clark Cnty. v. Sioux Equip. Corp.,* 2008 S.D.

60, ¶ 27, 753 N.W.2d 406, 416 (quoting *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 363 (5th Cir. 2005)).

[¶34.] Similarly, if not even more so, the legislatively created immunity in the context of self-defense provides a substantive right to be free from civil or criminal culpability. Unlike a statute of repose, which provides immunity after the passage of a legislatively determined amount of time, the self-defense immunity statute creates a presumptive right of immunity that precludes the State from arresting or commencing a criminal prosecution against a person who claims immunity. The statute does not merely "regulate the steps" of prosecution. Rather, it presumptively forecloses criminal culpability "once a prima facie claim of self-defense immunity has been raised by the defendant" unless the State establishes, "by clear and convincing evidence," that the defendant did not act in self-defense to overcome this immunity. The circuit court did not err by denying Smith's motion because the statute is substantive and not retroactive by its own terms.

    *b.*  *Prejudice*

[¶35.] In view of this Court's determination that the statute did not apply retroactively, no question remains whether the circuit court erred in denying Smith's request for a hearing. Even if the statute had applied retroactively, however, any error in denying Smith's request was not prejudicial.

[¶36.] At trial, Smith presented evidence that his use of force was justified, and the circuit court instructed the jury on his self-defense claim. The State ultimately met its burden of proving beyond a reasonable doubt that Smith is guilty and that the homicide was not justified, as the jury returned a verdict of guilty on

the charges for second-degree murder and aggravated assault. The State's proof of Smith's guilt beyond a reasonable doubt exceeded the "clear and convincing" burden that would have been on the State at a pretrial hearing to rebut the statutory immunity created by SDCL 22-18-4.8. Smith has not shown or identified any prejudice resulting from being denied an immunity hearing. *See* SDCL 23A-44-14 ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

### 2. *Evidence that Smith could not legally possess a firearm*

[¶37.] "We review evidentiary rulings for abuse of discretion." *State v. Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d 721, 727 (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d 404, 408). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (quoting *State v. Rodriguez*, 2020 S.D. 68, ¶ 41, 952 N.W.2d 244, 256). "To warrant reversal, 'not only must error be demonstrated, but it must also be shown to be prejudicial.'" *Id.* (quoting *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497). Error is prejudicial when it "in all probability . . . produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *State v. Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d 21, 30 (quoting *State v. Reeves*, 2021 S.D. 64, ¶ 11, 967 N.W.2d 144, 147).

[¶38.]     Smith argues that the court erred because the phrase "lawful defense" in SDCL 22-16-35[8] is another way of saying "justifiable" rather than a requirement that he be in compliance with all laws at the time he used force. He argues that the term refers to the lawful use of force rather than to whether he was breaking the law by being a felon in possession of a firearm that he was using to defend himself. In support, he distinguishes cases where the defendant raised an excusable homicide defense rather than a justifiable homicide defense.[9]  *See State v. Andrews*, 2001 S.D. 31, 623 N.W.2d 78 (evidence of defendant's illegal activities admissible on excusable homicide claim); *State v. Randle*, 2018 S.D. 61, 916 N.W.2d 461 (court's refusal to give jury instruction on excusable homicide defense prejudiced defendant). Smith does not, however, explain how he was prejudiced by the limited testimony that he was prohibited by statute from possessing a firearm.

[¶39.]     The State responds that the testimony went to Smith's state of mind because he knew he was prohibited from possessing a firearm and that this was relevant to his self-defense claim. The State notes that Smith was allowed to raise self-defense and have the jury instructed accordingly and that "[w]hether, under the particular facts of each case, homicide was justified is for the jury to decide." *State*

---

8.     SDCL 22-16-35 provided at the time of the offense that "[h]omicide is justifiable if committed by any person in the lawful defense of such person, or [another] . . . ."

9.     In comparison to the reference in SDCL 22-16-35 to a person acting "in the *lawful defense* of such person, or [another]," SDCL 22-16-30 provides that "[h]omicide is excusable if committed by accident and misfortune in doing *any lawful act*, with usual and ordinary caution." (Emphasis added.)

*v. Frias*, 2021 S.D. 26, ¶ 29, 959 N.W.2d 62, 70 (quoting *State v. Pellegrino*, 1998 S.D. 39, ¶ 18, 577 N.W.2d 590, 598).

[¶40.]     "Evidence is relevant if: (a) [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and (b) [t]he fact is of consequence in determining the action." SDCL 19-19-401. "When evidence has been deemed relevant, 'the balance tips emphatically in favor of admission unless the dangers set out in Rule 403 "substantially" outweigh probative value.'" *Shelton*, 2021 S.D. 22, ¶ 17, 958 N.W.2d at 727 (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 38, 693 N.W.2d 685, 698). "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403. "Prejudice 'refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'" *Shelton*, 2021 S.D. 22, ¶ 17, 958 N.W.2d at 727 (quoting *State v. Birdshead*, 2015 S.D. 77, ¶ 63, 871 N.W.2d 62, 83).

[¶41.]     The evidence that Smith could not lawfully possess a weapon undoubtedly would have been relevant to the status offense that was severed and later dismissed. Generally, a felon may not lawfully possess a firearm. *See* SDCL 22-14-15 ("No person who has been convicted in this state or elsewhere of a crime of violence or a felony pursuant to § 22-42-2, 22-42-3, 22-42-4, 22-42-7, 22-42-8, 22-42-9, 22-42-10 or 22-42-19, may possess or have control of a firearm."). However, "[t]he right of the citizens to bear arms in defense of themselves and the State shall not be denied." S.D. Const. art. VI, § 24. "Simply because a defendant is not permitted to

be in possession of a firearm does not mean he is necessarily guilty of violating a statute prohibiting possession of a firearm if he should come into control of the firearm for purposes of self-defense." *Conaty v. Solem*, 422 N.W.2d 102, 104 (S.D. 1988) (citing *United States v. Panter*, 688 F.2d 268 (5th Cir. 1982)). "This is especially true if the statute does not expressly demonstrate a legislative attempt to supersede the self-defense statutes by precluding such a person from claiming self-defense." *Id.* (citing *State v. Crawford*, 521 A.2d 1193 (Md. 1987)). "Under the appropriate factual setting, this defense is available." *Id.* (citing *United States v. Nolan*, 700 F.2d 479 (9th Cir. 1983); *United States v. Gant*, 691 F.2d 1159 (5th Cir. 1982)).

[¶42.]     Although the felon in possession of a firearm charge was not at issue at trial, the circuit court determined that the evidence that Smith was statutorily prohibited from possessing a firearm was relevant to, but did not preclude, his claim of self-defense. The court concluded this evidence went to the reasonableness of Smith's decision to arm himself before leaving the apartment, to his state of mind during this time, and to whether he reasonably apprehended he was in danger. The circuit court stated the evidence "would aid the jury in making a determination under the circumstances of the reasonableness of your conduct, Mr. Smith, and as to whether or not it was justifiable and because it's just one of those factors, like I mentioned, in all the other factors." Considering Rule 403, the court acknowledged

the evidence was prejudicial, but not unduly so, and that any prejudice did not substantially outweigh the probative value of the evidence.[10]

[¶43.]     In considering the relevance of this evidence to Smith's self-defense claim, we note that the jury was instructed to consider whether Smith had an honest and reasonable belief that that he would be killed or seriously injured. If such danger existed, the jury was instructed that Smith "may act to defend himself in such manner and with such means as may seem to him reasonably necessary in view of the circumstances." The fact that Smith was prohibited from possessing a firearm because of his status as a felon, but chose to arm himself before leaving the apartment, was at best tangential to the question of whether Smith acted reasonably for the purpose of self-defense. Under the instructions, the proper focal point of the reasonableness analysis for self-defense was not whether, as a convicted felon, Smith illegally armed himself before any need to defend himself arose. It was whether—at the moment Smith brandished and proceeded to fire the gun—he had a reasonable belief concerning the danger he faced and acted reasonably and proportionately in response. Further, under Rule 403, the minimal, if any, probative value of this evidence seems to be substantially outweighed by the danger of unfair prejudice resulting from the jury learning Smith was prohibited from possessing a firearm because he was a convicted felon.

---

10.     Smith does not directly challenge the court's balancing of the evidence under Rule 403. Rather, he argues that there was simply no relevance to the evidence since the felon in possession of a firearm and the "lawful defense" language in the justifiable homicide statute relate solely to whether he acted reasonably in using the firearm, not whether he was in lawful possession of the weapon at the time.

[¶44.]     Nonetheless, even if the circuit court abused its discretion in admitting this evidence, we must determine whether the error warrants reversal. Error is prejudicial when it "in all probability . . . produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d at 30 (quoting *Reeves*, 2021 S.D. 64, ¶ 11, 967 N.W.2d at 147). The evidence at issue was testimony from the detective that Smith was prohibited by statute from possessing a firearm, and there was no elaboration on the nature of the underlying felony conviction.[11] In contrast, the State presented overwhelming evidence that Smith's actions before and during the shooting were not for his self-defense. The State presented evidence that Smith opted to arm himself before there was any immediate threat to Smith or others, made statements about shooting others if he stepped outside, chose to go outside rather than stay in the apartment and call 911, and continued to pursue and shoot toward the young men as they attempted to flee the parking lot. We cannot say that the error in all probability produced an effect upon the verdict. Therefore, the erroneous admission of this testimony was not prejudicial.

### 3.     *Sufficiency of the evidence to sustain verdict*

[¶45.]     The circuit court determined there was sufficient evidence to support the jury's verdict. "Denial of a motion for acquittal is reviewed de novo." *Stone*, 2019 S.D. 18, ¶ 38, 925 N.W.2d at 500; *see also State v. Podzimek*, 2019 S.D. 43, ¶¶ 28–30, 932 N.W.2d 141, 149 (applying same de novo review to denial of motion to

---

11.     The fact that Smith had previously been convicted of a felony was mentioned as part of the limiting instruction, without objection, but there was no further elaboration on this conviction in the instruction or the evidence.

set aside verdict). "When conducting our review, we 'determine whether the evidence was sufficient to sustain the conviction.'" *Stone*, 2019 S.D. 18, ¶ 38, 925 N.W.2d at 500 (quoting *State v. Quist*, 2018 S.D. 30, ¶ 13, 910 N.W.2d 900, 904). "To do so, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Quist*, 2018 S.D. 30, ¶ 13, 910 N.W.2d at 904). "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (quoting *State v. Martin*, 2017 S.D. 65, ¶ 6, 903 N.W.2d 749, 751). "[W]e 'will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence.'" *State v. Manning*, 2023 S.D. 7, ¶ 27, 985 N.W.2d 743, 752 (quoting *State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313). "[T]he jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* ¶ 27, 985 N.W.2d at 753 (quoting *Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d at 313).

[¶46.] Smith argues that the evidence "can only reasonably be interpreted to show" he feared for his own life and those of Christina and Martece starting from Christina's receipt of the Snapchat and continuing throughout the time "the angry mob showed up and started trying to kick in the door of the [Christina/Martece] apartment. Smith's fear of imminent death or severe bodily injury only ceased when the angry mob had [dispersed] from the parking lot." He points to Christina's testimony as evidence that he reasonably believed he could be killed or seriously injured and acted reasonably in light of the circumstances.

[¶47.] The State argues that the evidence supports the jury's verdict because it establishes the elements of the offenses. The State cites *State v. Satter* to support its assertion that Smith evinced a depraved mind when he shot into a crowd. 1996 S.D. 9, ¶ 21, 543 N.W.2d 249, 253. The State also argues that the evidence shows the shooting was not justified as Smith did not act reasonably when he armed himself and left the apartment instead of staying inside and calling the police. The State notes he was not "in the midst of an attack[.]" *See State v. Burtzlaff*, 493 N.W.2d 1, 8 (S.D. 1992). The State argues that Smith's statement about going outside to shoot and his decision to shoot multiple times as others were running away also demonstrated the shooting was not justified. The State further contends that Smith's return to Minneapolis and his decision to cut his hair provide circumstantial evidence of his consciousness of guilt. *See State v. Falkenberg*, 2021 S.D. 59, ¶ 43, 965 N.W.2d 580, 592; *State v. Owens*, 2002 S.D. 42, ¶ 82, 643 N.W.2d 735, 756.

[¶48.] The elements of second-degree murder require a showing of "any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person[.]" SDCL 22-16-7. "Homicide is manslaughter in the first degree if perpetrated . . . [w]ithout any design to effect death . . . but by means of a dangerous weapon[.]" SDCL 22-16-15(3). "When a homicide defendant raises self-defense or justification, the State must prove beyond a reasonable doubt that the killing was without authority of law." *Pellegrino*, 1998 S.D. 39, ¶ 19, 577 N.W.2d at 598.

[¶49.] Smith did not deny that he caused Larry's death. In his interview with law enforcement, his account of the events was that he began shooting because of the actions of one of the men coming toward him and that he had no design to shoot Larry in particular. It is clear from the verdict that the jury rejected Smith's version of the facts, including Christina's testimony concerning Smith's actions. The State presented evidence that Smith did not act in self-defense. This included evidence that neither he nor the others in the apartment were fearful of the crowd gathering in the parking lot, that they did not attempt to contact law enforcement, that Smith already planned to start shooting before he went outside the locked apartment, and that Smith continued pursuing and shooting toward the group that was scattering from the parking lot. In addition to testimony, the video from the nearby business shows Smith exiting the apartment and walking toward the men who had gathered in the parking lot. Josh was still at a distance when Smith began to fire, and Smith continued to fire the weapon even as the men ran away. The video also shows him point the gun toward a busy street. The State also put on evidence that the only weapon recovered from the men in the parking lot was an unloaded gun in a closed satchel.

[¶50.] Our cases support that shooting into a crowd shows a lack of regard for human life. *See Satter*, 1996 S.D. 9, ¶ 21, 543 N.W.2d at 253. Further, "[w]hen a defendant claims justifiable homicide because he was threatened with serious bodily injury, the responding 'force becomes limited to that which is reasonable in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of the force used.'" *State v. Cottier*, 2008 S.D. 79, ¶ 13, 755 N.W.2d 120, 127

(quoting *State v. Jaques*, 428 N.W.2d 260, 265–66 (S.D. 1988)). It is for the jury to decide if homicide was justified. *Frias*, 2021 S.D. 26, ¶ 29, 959 N.W.2d at 70. The jury had the opportunity to consider all the evidence, including conflicting witness testimony, to weigh the credibility of the witnesses, and to make its determinations as to whether Smith was acting reasonably in self-defense. The evidence supports the jury's determination that Smith committed second-degree murder.[12]

[¶51.] Finally, Smith was convicted of aggravated assault under SDCL 22-18-1.1(2). The statute provides "[a]ny person who . . . [a]ttempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon . . . is guilty of aggravated assault." *Id.* One who "[a]ttempts by physical menace with a dangerous weapon to put another in fear of imminent serious bodily harm" is also guilty of aggravated assault. SDCL 22-18-1.1(5). The jury determined that Smith was guilty of aggravated assault toward Josh, Jevon, and Joseph under both theories. Smith does not dispute that he used deadly force and injured Josh and Jevon by shooting them. The same evidence that supported the jury's finding that Smith evinced a depraved mind supported the jury's conclusion that Smith was attempting to cause or knowingly caused bodily injury with a firearm or attempting to put Josh, Jevon,

---

12. While there is no sentence imposed, the evidence is also sufficient to support the manslaughter conviction. We once again begin with Smith's admission that he caused Larry's death. The other element the State needed to prove to establish this crime was that Smith effected Larry's death by means of a dangerous weapon. Test fires from the weapon that Christina told law enforcement about and that LJ and Tenessa brought to the police station matched the bullet recovered from Larry at his autopsy and a bullet found at the scene. Although LJ did not know at the time that he was helping to hide the gun that killed his father, witnesses testified that Smith used it when he shot Josh, Jevon, and Larry. Larry died as a result of the gunshot wound to his abdomen.

and Joseph in fear of imminent serious bodily harm by physical menace with a deadly weapon and that these actions were without justification.

[¶52.] The evidence was sufficient to support the elements of second-degree murder and of aggravated assault. The evidence was also sufficient to support the jury's verdict that Smith was not justified in killing Larry or in assaulting Josh, Jevon, and Joseph with a dangerous weapon. The court properly denied Smith's motions for judgment of acquittal.

### 4. Mistrial

[¶53.] "[T]his Court reviews the trial court's 'denial of a motion for mistrial under the abuse of discretion standard.'" *Stone*, 2019 S.D. 18, ¶ 34, 925 N.W.2d at 499 (alteration in original) (quoting *State v. Kvasnicka*, 2013 S.D. 25, ¶ 17, 829 N.W.2d 123, 127). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d at 727 (quoting *Rodriguez*, 2020 S.D. 68, ¶ 41, 952 N.W.2d at 256). "To warrant reversal, 'not only must error be demonstrated, but it must also be shown to be prejudicial.'" *Id.* (quoting *Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d at 497). Error is prejudicial when it "in all probability . . . produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d at 30 (quoting *Reeves*, 2021 S.D. 64, ¶ 11, 967 N.W.2d at 147).

[¶54.] Smith claims that because he was being tried for, among other charges, second-degree murder and first-degree manslaughter and claimed self-

defense, "the testimony of a witness that he was just released from prison no doubt had an effect on the jury even though the trial court had admonished the jury. Coupled with the fact that the jury was instructed that Smith couldn't lawfully possess a gun and further that he was just released from prison, prejudice is presumed[.]"

[¶55.] Smith does not claim that the State intentionally elicited the forbidden testimony, or that the jury did not abide by the curative instruction. Beyond his conclusory remarks regarding prejudice, Smith fails to show how the single inadvertent reference to his incarceration produced an effect upon the final result. We "presume that juries understand and abide by curative instructions." *State v. Dillon*, 2010 S.D. 72, ¶ 28, 788 N.W.2d 360, 369. Further, the circuit court had the opportunity to observe the momentary testimony that was elicited and any impact of that testimony on the jury. *See State v. Kryger*, 2018 S.D. 13, ¶¶ 32–37, 907 N.W.2d 800, 812–13 (holding no abuse of discretion in denying motions for mistrial when the court gave limiting instructions and considered the impact of the errors, including that the jury heard that the defendant had a parole officer and was incarcerated and that the jury had an accidental encounter with the defendant while under escort). Given the brief nature of this testimony and the court's immediate remedial action to address the issue, we cannot say the circuit court abused its discretion in denying Smith's motion for mistrial.

[¶56.] Affirmed.

[¶57.] KERN, SALTER, DEVANEY, and MYREN, Justices, concur.